Blankenship *v.* W. E. Cox & Sons.

4-6765                                    162 S. W. 2d 918

Opinion delivered June 1, 1942.

428

*John R. Thompson, J. H. Lookadoo* and *Steve Carrigan,* for appellants.

*W. S. Atkins* and *Ned Stewart,* for appellees.

GRIFFIN SMITH, C. J. Two causes were consolidated. The appeals are from judgments rendered on jury verdicts for the defendants, partners who operated farms and gins. On behalf of John Blankenship, a minor, it is contended he was employed in violation of Initiative Act No. 1. Pope's Digest, §§ 9068, 9069, 9071.

The second contention relates to the suit of D. W. Futrell, administrator of the estate of Alfred H. Futrell. It is conceded there was substantial testimony upon which the triers of facts could have found for or against the defendants as to either plaintiff. Unless instructions were erroneous, the judgments must be affirmed.[1]

Alfred Futrell, a cripple, had been employed by W. E. Cox & Sons since 1928. For a number of years he had been general foreman, supervising operations of gins and other machinery. Because of physical impairments it was Futrell's custom to sit near when men were working and to explain to them how the work should be done. The Cox gin at Fulton was being overhauled. When in service it was driven by a gasoline engine. July 20 and

---

[1] A gasoline explosion in a gin owned and operated by defendants caused Alfred Futrell's death and severe injuries to young Blankenship. It occurred July 21, 1938, slightly less than a month before John would have been fifteen years of age.

21 men had been working in the engine room. Alfred Yarbrough testified that late in the afternoon (July 21) he was sent by Ernest Cox to procure five gallons of gasoline for use in cleaning machinery. There is testimony that a tub and bucket were partially filled with the fluid, into which rags were dipped and applied to the machinery. As a consequence, gasoline dripped to the concrete floor and formed small pools in recesses until the restricted area in which operations were being conducted became permeated.

Yarbrough asserted that Ernest Cox directed the work. Cox testified he had spent part of the day in the engine room, but contended he did not exercise authority because Futrell was foreman and had charge of the work. An extension cord approximately twenty feet long was utilized in examining the engine. Yarbrough's explanation of the fire was that insulation had been worn from a four,- five,- or six-inch section of the cord, permitting wires to contact and form a short circuit. The cord, he said, had been frequently dragged over the floor. Yarbrough was looking at the cord—presumably the end to which the light socket was connected—when the flash occurred and the gasoline was set on fire.

John Blankenship had been assisting a painter with outside work, but finished the assignment about thirty minutes before quitting time. Yarbrough and Blankenship asked Futrell what to do. He directed that they help clean the engine. Futrell was sitting near a door and had been working on a lock from a door on Kenneth Cox' automobile. Blankenship, at the time of trial, weighed 163 pounds, and was six feet and one inch tall. He was paid $1.25 per day.

In testifying regarding the extension cord, Yarbrough asserted that Ernest Cox was present when it was being used, and that the exposed wires were easily seen. This witness also testified: ". . . the extension cord was on the floor when we began cleaning the engine, under Mr. Cox's direction. . . . When Mr. Cox was there he was the boss around the engine."

The inference is clear that the cord belonged to Futrell, or that it was kept by him and carried from place

to place for use as occasion might require. Futrell had a chest containing various tools, in which the cord had been frequently seen. Some of the tools were sent to Mrs. Futrell after her husband died, but the cord was not in evidence, although witnesses testified to having seen it after the fire. Some were of opinion that the insulation referred to by Yarbrough as having been worn away was destroyed by fire.

Blankenship's burns confined him to a hospital for three weeks. Medical treatment was required thereafter. Futrell died twenty-six hours after receiving burns.

Instruction No. 6, given on request of the defendants, reflects the trial court's construction of the law applicable to Futrell:—"If you find from the evidence that the light extension cord in question was the property of Futrell, then you will find for the defendants in the Futrell case."

Objection was that even though the cord belonged to Futrell, it was being negligently used at the time the fire started, and such use was supervised by Ernest Cox. The court was asked to amend the instruction by adding: "Unless you further find that at the time the extension cord was put in use by the deceased, it was defective, or in an unsafe condition."

There is testimony that it was customary for Futrell to engage employes for Cox & Sons. Also, it is in evidence that Cox & Sons did the hiring and that Futrell's duties were to superintend. While Yarbrough may be inaccurate in saying Ernest Cox was directing work in the engine room at the time the fire occurred, nevertheless Yarbrough did give testimony to that effect, and he coupled with such testimony the assertion that Futrell was otherwise engaged for perhaps twenty minutes preceding the blaze, and that Cox directed the cleaning process.

It would be formulary to say, as a matter of law, that because of the prevailing custom permitting Futrell to superintend mechanical operations, responsibility for specific conduct engaged in by employes in the immediate presence of Ernest Cox was deflected in such a

way as to clear the partnership and attach to Futrell—and this upon the theory that if Futrell *owned* the extension cord there could be no recovery by the administrator. Instruction No. 6 is what is termed "binding". It closes with the expression, ". . . then you will find for the defendants". Although evidence strongly indicates the cord was owned by Futrell or was so commonly utilized by him as to justify the presumption that if it were purchased by the Cox partnership, members of the firm were not concerned regarding it, there was no special finding of ownership. We do not, however, regard this as controlling.

Appellees' contention is that ". . . if the jury found that the . . . cord in question was defective and caused the fire and was the property of Alfred Futrell, and that Futrell was foreman and had charge and was superintending and directing the work, then, in this event, it is a well-settled rule of law that 'no liability [is] incurred when the employe's knowledge equals or exceeds that of the employer' ".

A flaw in this statement is assumption that the cord was defective when put to use by Futrell the previous day. Also, there is conflict in the testimony regarding relative activities of Ernest Cox and Futrell. Result is that a "binding" instruction which omitted essential elements should not have been given; nor could the vice be cured by giving an appropriate instruction.

Was the court in error when it refused to give plaintiff's requested Instruction No. 1 in the Blankenship case?

Sections 2, 3, and 4 of the law which it is contended controls are copied in the margin.[2] The instruction asked

[2] Section 2: "No child under sixteen years shall be employed or permitted to work in any occupation dangerous to the life and limb, or injurious to the health and morals of such child. . . ." (Pope's Digest, § 9068).

Section 3: "No child under sixteen shall be employed or permitted to work at any of the following occupations: (1) adjusting any belt to any machinery; (2) sewing or lacing machine belts in any workshop or factory; (3) oiling, wiping or cleaning machinery or assisting therein; (4) operating or assisting in operating any of the following machines: (a) circular or band saws; (b) wood shapers; (c) wood jointers; (d) planers; (e) sandpaper of wood polishing ma-

would have told the jury no child under sixteen years of age may be lawfully employed to oil, wipe, or clean machinery or assist "therein or about" in connection with any process in which dangerous or poisonous acids or gases or other chemicals are used. . . . "Therefore you are told that (as the undisputed evidence shows that John Blankenship, who was under sixteen years of age, was employed by W. E. Cox & Sons, in oiling, wiping or cleaning machinery or assisting therein in, about, and in connection with processes in which dangerous and poisonous acids or gases and other chemicals were used, and [was employed to] wipe and clean machinery with rags dipped in gasoline from open containers and being used at the time to clean machinery) . . . [this] was an occupation dangerous to life and limb, and injurious to the health and morals of John Blankenship, and [if] as a result of such employment John Blankenship suffered certain personal injuries, . . . the defendants are liable to John Blankenship. . . ."

There was no testimony that poisonous acids or other chamicals were used. We have judicial knowledge of the fact that in certain circumstances inflammable gases are created in consequence of evaporation of gasoline and its mixture with air. The lower court was justified in refusing to give the instruction on account of. the extraneous matter it contained, including the reference

chinery; (f) wood turning or boring machinery; (g) picker machines or machines used in picking wool; (h) carding machines; (i) job or cylinder printing presses operated by power other than feet power; (j) boring or drill presses; (k) stamping machines used in metal or in paper or leather manufacturing; (l) metal or paper cutting machines; (m) corner staying machines in paper box factories; (n) steam boilers; (o) dough brakes or cracker machinery of any description; (p) wire or iron straightening or drawing machinery; (q) rolling mill machinery; (r) washing, grinding or mixing machinery; (s) laundering machinery; (5) or in proximity to any hazardous or unguarded belt, machinery or gearing; (6) or upon any railroad, whether steam, electric or hydraulic." (Pope's Digest, § 9069).

Section 4: "No child under the age of sixteen shall be employed, permitted or suffered to work in any capacity; (1) in, about or in connection with any processes in which dangerous or poisonous acids or gases or other chemicals are used; (2) nor in soldering; (3) nor in occupations causing dust in injurious quantities; (4) nor in scaffolding; (5) nor in heavy work in the building trades; (6) nor in any tunnel or excavation; (7) nor in any mine, coal breaker, coke oven, or quarry; (6) nor in a bowling alley or pool or billiard room; nor in any other occupation dangerous to the life and limb, or injurious to the health and morals of such child." (Pope's Digest, § 9071).

to occupations injurious to the health and morals of the plaintiff.

Similar objections are open to requested Instruction No. 2.

An instruction was that if the jury should find from a preponderance of the evidence that the explosion and resulting fire were caused by acts of the defendants in having employes wipe machinery with rags dipped in gasoline supplied in open containers in the engine room in proximity to charged electric wires, and that the defendants, as ordinarily careful and prudent persons, knew, or should have known, that this method of work was dangerous and could easily result in a fire or explosion, and that as a result of such negligence the explosion occurred and Blankenship was injured, "then you should find for the plaintiff Blankenship."

There was objection, general and specific, to the court's action in giving defendant's Instruction No. 7:— "The mere use of gasoline is not in itself negligence, unless it should be further shown that it was used under such circumstances as would cause a reasonably prudent person to anticipate that it would be ignited."

Does § 9069 of Pope's Digest, which directs employers not to permit a child under sixteen years of age to oil, wipe, or clean machinery, or assist therein, prohibit such minors from engaging in the character of work John Blankenship is shown to have been doing? It is conceded he was wiping or cleaning machinery. What, then, was the intent of the statute?

Recovery was allowed in *Terry Dairy Co.* v. *Nalley,* 146 Ark. 448, 225 S. W. 887, 12 A. L. R. 1208, on the theory that violation of the statute was the proximate cause of injury, there having been no intervening agency. So, in *Fort Smith Rim & Bow Company* v. *Qualls,* 146 Ark. 475, 225 S. W. 892. In the Dairy Company case it was said: ". . . the undisputed evidence shows that the child was injured while in the course of his employment, and the court properly took the question of proximate cause from the jury." Further comment was that employment of a minor in violation of the statute is negligence *per se.*

If the injury is caused by reason of such employment, the act of employment is negligence, and is the cause from which the result came.

Indicative of the legislative intent regarding Initiative Act No. 1 is the second paragraph of § 3, authorizing the state board of health to conduct hearings, and ". . . determine what other occupations are sufficiently dangerous to the life or limb or injurious to the health or morals of children under sixteen years to justify their exclusion therefrom. . . ."

If preservation of life or limb, and guardianship of health and morals of children, prompted initiation of the Act, can it be said there was an intent by those who framed the measure, or by the people who adopted it, to prohibit a child under sixteen from cleaning a nonoperating gasoline engine? Was the word "machinery" intended to be all-inclusive, and to embrace mechanical contrivances of every kind and to prohibit persons who had not reached the designated age from using an oiled or gasolined rag in cleaning at a time when the contrivance or machine is not in use, cannot be operated, and is no more dangerous than a parked automobile from which the battery has been taken and the brakes set?

Webster's International Dictionary defines a machine as any device consisting of two or more resistant, relatively constrained parts, which, by a certain predetermined intermotion, may serve to transmit and modify force and motion so as to produce some given effect or to do some desired kind of work. . . . "According to the strict definition, a crowbar abutting against a fulcrum, a pair of pliers in use, or a simple pulley block with its fall, would be a machine, but ordinary use would hardly include such as these; while an implement or tool whose parts have no relative movement, as a hammer, saw, chisel, plane, or the like, would not, of itself, in any case be a machine.

"Popularly and in the wider mechanical sense, a machine is a more or less complex combination of mechanical parts, as levers, gears, sprocket wheels, pulleys, shafts and spindles, ropes, chains, and bands, cams and

other turning and sliding pieces, springs, confined fluids, etc., together with the framework and fastenings supporting and connecting them, as when it is designed to operate upon material to change it in some preconceived and definite manner, to lift or transport loads, etc."

Taking into consideration the evil sought to be remedied, "machinery," as used in the Act, must mean a more or less complex combination of mechanical parts operating in such manner as to fascinate or confound a person of tender years; and as to such contrivances it was the intent to prevent children from having access to them at a time and in circumstances when harm might conceivably result. To say it was the purpose to prohibit persons under sixteen years of age from cleaning the base of an engine made harmless by disuse, as to which there are no moving parts, would be carrying construction beyond reason.

An Alabama statute prohibited employment of boys under fourteen years of age in any mine. In *Sloss-Sheffield Steel & Iron Co.* v. *Bearden,* 199 Ala. 132, 74 So. 230, it was held that while § 1033 of the Code of 1907 applied to ore as well as coal mines, "we think that, regardless of the technical definition of the word 'mine', it was the legislative purpose to protect employes in underground mines, whether coal or ore, and not in open or surface mines, such as the one here involved."

In *Daniels* v. *Thacker Fuel Co.,* 79 W. Va. 255, 90 S. E. 840, the holding was that a statute prohibiting employment of boys under fourteen years of age "in any coal mine" did not mean "in or about a coal mine."

It will be observed that § 9069 relates to enumerated "occupations." Certainly, in 1915, oiling and wiping idle machinery was not an occupation in Arkansas. Conversely, oiling and wiping machinery in operation was so generally engaged in that framers of the law might well have had in mind saw mills, cotton gins, and factories.

We must assume, therefore, that in using the word "machinery" Act writers and the people visualized what a reasonable person would see in words arranged as

those appearing in the sections urged by appellant Blankenship as authority for the proposition that his injuries were traceable to appellees' disobedience of law.

It follows that the court did not err in refusing to hold, as a matter of law, that the defendants were liable for Blankenship's injuries merely because he was employed to clean an idle engine, no part of which featured in the result complained of. Nor is gasoline dangerous, *per se*. The court was correct in instructing that before the fact of its use could be relied upon as a basis of liability, it was essential to find that circumstances were such as to cause a reasonably prudent person to anticipate that its fumes might be ignited.

The judgment in the Blankenship case is affirmed. As to Futrell, the judgment is reversed and the cause is remanded for a new trial if the plaintiff so desires.

Mr. Justice HUMPHREYS dissents in the Blankenship case. Mr. Justice MEHAFFY concurs in the Futrell case and dissents in the Blankenship case.