BEN PEARSON, INC., *v.* THE JOHN RUST COMPANY.

5-340                             268 S. W. 2d 893

Opinion delivered May 24, 1954.

[Rehearing denied July 15, 1954.]

*Feiskell Weatherford, Jr.,* and *Jay W. Dickey,* for appellant.

*John H. Sutherland, Bridges & Young* and *Henry W. Gregory, Jr.,* for appellee.

J. SEABORN HOLT, J. This suit was brought by appellees against appellant to recover approximately $150,000 alleged due as royalties on cotton picking machines accruing under a "License Agreement," or contract, executed by the parties April 1, 1949. This action covers

the period from January 1, 1950, to June 30, 1951. The trial court, at the close of all the testimony held, in effect, that the terms and provisions of the License Agreement were plain and unambiguous, that no issue was made for the jury, that only a question of law was involved, that the construction and meaning of the contract was for the court to determine and directed a verdict for appellees. This appeal followed.

The pertinent parts of the License Agreement were: "WHEREAS, Rust an inventor and patentee, is the individual and sole owner, subject to contracts hereinafter referred to, of the inventions and patent rights to improvements in cotton picking machines for which letters patent of the United States were issued to the said Rust, with serial numbers and dates of issue as follows: (Nine patents covering period from Jan. 1, 1935, through Jan. 11, 1949) and as joint inventor and patentee is joint owner of the improvements in cotton picking machines for which letters patent of the United States were issued to the said Rust and his brother jointly, with serial numbers and dates of issue as follows: (Nine patents covering period from Jan. 10, 1933, through Jan. 17, 1939), and

"WHEREAS, Rust, as inventor, is the individual and sole owner, subject to the aforesaid contracts, of any letters patent of the United States which might be issued to the said Rust on the applications now on file in the United States Patent Office which bear serial numbers and dates as follows: (Fifteen patents covering period from Mar. 29, 1944, through Jan. 12, 1948). * * *

"WHEREAS, Pearson desires to obtain a license for manufacture and sale of Rust Cotton Pickers under the aforesaid patents, issued and pending, and any future patents that may be issued to Rust for any other inventions covering improvements in cotton picking machines. * * *

"Said Foundation grants to the said Pearson a license to manufacture and sell cotton picking machines embodying the inventions and improvements covered by

the aforesaid patents, issued or pending, and all other patents or inventions covering cotton picker improvements that have been or may be issued to the said Rust by the United States Patent Office; all rights granted herein to extend throughout the life of the said Letters Patent or any reissue of same, subject only to the terms hereinafter provided.  *  *  *

"2. Royalty. It is stipulated and agreed that on each and every cotton picking machine and all cotton picker parts and equipment embodying the invention or inventions of said Letters Patent, manufactured in whole or in part and sold by Pearson said Pearson shall pay to said Foundation a license fee, or royalty as follows: On the first one thousand (1,000) machines, ten per cent (10%) of the retail price, and on each machine thereafter, five per cent (5%) of the retail price; and on parts and equipment, five per cent (5%) of the retail price."

The record is voluminous, comprising some 750 pages. However, the issues presented are fairly simple. Appellant, Pearson, says: "The entire controversy centers about the question—What are 'cotton picking machines embodying the invention or inventions of said Letters Patent' and what are 'cotton picker parts and equipment embodying the invention or inventions of said Letters Patent,' and the controversy therefore centers upon a determination of what devices come within the scope of the patents licensed? Thus it will be seen that the question is primarily a two part question: first, what is the scope of the patents, and second, what devices fall within the scope of those patents so as to form the basis for the computation of royalties?" and argues that the controversy involves mixed questions of law and fact which should be submitted to the jury.

Appellees say: "The simple issue before the court is this: giving the words their 'ordinary meaning,' when appellant agreed to pay a royalty on the retail price of a 'cotton picking machine,' did it agree to pay on the whole machine, or just a part of it?"

The court's directive to the jury was: "The jury is instructed to find that the term 'Cotton Picking Machine' as used in paragraph 2 of the License Agreement of April 1, 1949, between the parties hereto, and as used elsewhere in said agreement means and meant at the time of the signing of the contract the whole assembly manufactured and sold by the defendant under the name of 'Rust Cotton Picker,' " and to return a verdict for appellees.

Since the trial court directed a verdict for appellees at the close of the evidence, we must consider the testimony in the light most favorable to appellant, the party against whom the verdict was directed, in determining whether there was any substantial evidence to make a jury question.

We agree with the trial court's conclusion that the License Agreement here is couched in plain, understandable, and unambiguous language, and that it was the court's duty to discover and interpret its meaning and enforce it.

"The rules applicable to the construction of contracts generally apply to the construction of license agreements. Such contracts will be construed according to the intention of the parties as expressed in the contract as a whole * * *.

"The language used is to be given its ordinary meaning, and a license agreement should be interpreted so as to give meaning to all of its terms if possible. Particular terms used in the license must be interpreted in connection with the other words employed." 69 C. J. S., § 249, p. 770.

We said in *Dent, Adm'r.* v. *Industrial Oil & Gas Co.*, 197 Ark. 95, 122 S. W. 2d 162: "The interpretation of a contract is the determination of the meaning attached to the words * * * which make the contract. It is the duty of courts to discover the meaning of a specific contract, and to enforce it without leaning in either direction, when the parties stood on an equal footing and were free to do what they chose."

" 'The parties having made this contract in clear and unambiguous language, it is the duty of the court to construe it according to the plain meaning of the language employed, and not to enlarge or extend its terms on any theory.' " *Rains Coal Corporation* v. *Southern Coal Company, Inc.,* 202 Ark. 1077, 155 S. W. 2d 348.

" 'The first rule of interpretation is to give to the language employed by the parties to a contract the meaning they intended. It is the duty of the court to do this from the language used where it is plain and unambiguous.' " *Lee Wilson & Co.* v. *Fleming,* 203 Ark. 417, 156 S. W. 2d 893.

We think it clear that throughout the four corners of this License Agreement and in the various patents held by appellees, the words (or terms) "Cotton Picking Machine," "Rust Cotton Pickers," and "Machine" were used by the parties synonymously and meant the same thing as appellees stoutly insist. From the entire record, we are convinced that appellant was in full agreement with appellees that these terms as used in the contract were synonymous and meant the same thing and that the parties so intended.

Mr. Haun, appellant's president, who negotiated and signed the License Agreement here on behalf of appellant, in a self explanatory letter to appellees, dated March 9, 1949, less than a month before the contract was signed, clearly revealed that these terms meant the same thing to him. The letter recites: "Dear Mr. Rust: In accordance with our conversation of today, we propose the following arrangement for the manufacture of the Rust Cotton Picker. Ben Pearson, Incorporated will do as follows:

"1. We will pay you a royalty of 10% of our selling price on the first 1,000 machines manufactured. After this, the royalty will be 5%.

"2. We will pay you the sum of $6,000.00, above taxes, (figured on the basis of being your sole income) per year for your services as consultant, and the use of your knowledge and ability in future improvements

and development of the machine; also for promoting the sale of this machine. Your entire time would not be required.

"3. Providing there is not too long a delay in securing materials and dies, and completion of this agreement; and provided we are not hindered from reaching these minimums, due to conditions beyond our control, we agree to manufacture a minimum of 100 machines in 1949; a minimum of 500 machines in 1950; a minimum of 1,000 machines annually thereafter, with the understanding that if we fail to do so, you will have the right to license the manufacture of this machine to others.

"While the above are set out as minimums, we will expect to be able to, and will use every effort to produce far in excess of them, and production of these minimums is based on being able to sell and deliver the machines when they are finished.

"You agree as follows: 1. You agree to license us for the sole manufacture of this machine, with the exception of the license you now have out to Allis-Chalmers, providing we produce the minimums mentioned above. 2. You agree to work toward the improvement and future development of the machine, and to furnish us with the benefits derived therefrom.

"We are mutually agreed that the idea of marketing these machines through the co-ops is sound, and this procedure should be followed.

"Before final agreement, we are to be furnished orders for 100 machines, with cash deposit of $1,000.00 per machine, balance to be paid when ready for delivery.

"It is our understanding that you own all the patents and have the right to license us, and that you will protect us against any damage that may arise from our manufacturing the Rust Cotton Picker under this license.

"These machines are to be marketed under your name. Yours very truly, Ben Pearson, Inc. (Signed) Carl B. Haun, President."

At the trial, Mr. Haun testified: "Mr. Haun, how do you obtain your orders for a Rust Cotton Picker —what I am asking is, when a person orders it, the purchaser, don't they just order a Rust Cotton Picker at a certain price? A. Yes, ordinarily they do. Q. That is the way they order it? A. Yes. Q. Then you send the entire assembly, don't you? A. Yes. Q. Can you tell me during the entire 18 months period involved in this case, from January 1, 1950, through June 30, 1951, when you invoiced a sale of a Rust Cotton Picker, that you made an invoice setting forth separately the items, in one single instance, for a picking unit or a tractor? A. The dealer wasn't interested in that. Q. I am not asking you if the dealer was interested in that —did you? A. I don't think we did."

Appellant was simply required to pay a certain royalty on "every cotton picking machine and all cotton picker parts and equipment embodying the invention or inventions of said Letters Patent, manufactured in whole or in part and sold by Pearson, said Pearson shall pay to said Foundation a license fee, or royalty, as follows, etc." Obviously, he was not required to pay a royalty on any unpatented, separate part of the machine, or cotton picker, when sold as a separate part. The Cotton Picking Machine as a complete unit contained many unpatented parts, such as tires, bolts, nuts, springs, chains, wire, sheet metal, etc., but when sold as a complete machine, single or double unit, Pearson, appellant, must pay the royalty.

"The term 'royalties,' had its origin in the designation of the payments made to a monarch or sovereign by his subjects for privileges granted by the former and enjoyed by the latter. * * * In modern usage, * * * signifies sums paid to the owner of a patent for its use or for the right to operate under it, and may also refer to the obligation giving rise to the right to such sums." *Taylor* v. *Peck,* 160 Ohio St. 288, 116 N. E. 2d 417.

In *Volk* v. *Volk Manufacturing Co.,* 101 Conn. 594, 126 A. 847, it was said: "The use of the term 'royalty'

as applied to a patent is a tax or duty paid to the owner of a patent for the privilege of manufacturing or using the patented article. * * * But this is not its exclusive meaning * * * it is likewise an appropriate term as applied to improvements which are nonpatentable.''

The fact that unpatented parts are sold as components of an entire machine, embodied in a picking unit, and everything necessary to pick cotton does not relieve Pearson of the royalty on the complete machine. When such parts are assembled and sold together, they, in effect, lose their identity as parts and become fractions of the entire unit or machine on which the royalty must be paid.

We adopted this definition of Webster's of ''Machines'' in *Blankenship* v. *W. E. Cox & Sons*, 204 Ark. 427, 162 S. W. 2d 918: ''Popularly and in the wider mechanical sense, a machine is a more or less complex combination of mechanical parts, as levers, gears, sprocket wheels, pulleys, shafts and spindles, ropes, chains, and bands, cams and other turning and sliding pieces, springs, confined fluids, etc., together with the framework and fastenings supporting and connecting them, as when it is designed to operate upon material to change it in some preconceived and definite manner, to lift or transport loads, etc.''

''The term machine includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result.'' *Corning* v. *Burden*, 56 U. S. (15 How.) 252, 14 L. Ed. 683.

It was stipulated that ''most of the Rust Cotton Pickers manufactured by appellant during the period in question contained the lettering and name 'Rust Cotton Picker, manufactured by Ben Pearson, Inc., Pine Bluff. Ark.' * * * Prior to the period in suit, appellant had manufactured and sold only 99 Rust Cotton Pickers, all of the single-row model.''

Appellant's answer further admitted the number and retail prices of all Rust Cotton Pickers (both single-row and tandem or two-row) manufactured and sold during the period involved here.

After a review of this record, without attempting to detail the testimony, we are unable to find any disputed material fact question, or any substantial evidence whatever, tending to support appellant's theory of this case, to make a jury issue. We hold that the question presented was solely one of law for the trial court, in the circumstances, and that the instructed verdict in favor of appellees was correct.

Affirmed.