## MacCLUNEY v. KELSEY–HAYES WHEEL CO. et al.

### No. 7130.

United States District Court
E. D. Michigan, S. D.

Oct. 21, 1949.

As Amended Jan. 20, 1950.

Daniel Hodgman, Detroit, Michigan, for plaintiff.

Butzel, Eaman, Long, Gust & Kennedy, Detroit, Michigan, Perkins, Malone & Washburn, New York City, for defendants.

KOSCINSKI, District Judge.

1. Letters Patent were issued by the United States Patent Office to the plaintiff as inventor of a "pelican hook" for lashing or fastening of heavy objects on moving vehicles and ships at sea.

2. On July 18, 1944 plaintiff entered into an agreement with the defendant, embodied in the following letter:

"Mr. Robert MacCluney,
"Island Park, New York.
"Dear Sir:

"This will confirm the manufacturing and selling agreement between you, William Robert MacCluney, and the Kelsey-Hayes Wheel Company. You, as the inventor of certain inventions of Pelican Hooks, agree to give the Kelsey-Hayes Wheel Company and its subsidiaries exclusive manufacturing and selling rights on said Pelican Hooks insofar as any present or future patents may be concerned for both Domestic and Export Distribution. Kelsey-Hayes Wheel Company in turn agree to pay you 10% on all net sales derived from the sale of said Pelican Hooks.
"The Kelsey-Hayes Wheel Company agrees to diligently pursue the distribution and sales of this product.
"Acceptance of this letter and arrangement are so designated by the signatures below.
        "Yours very truly,
        "Kelsey-Hayes Wheel Company
        "(s) Harry Williams
        "Harry Williams, Vice President.
"Accepted
"(s) William Robt. MacCluney
"July 20, '44."

3. In anticipation of the foregoing agreement, plaintiff, on June 7, 1944, assigned to Mrs. Virginia Hatch thirty-three and one-third per cent of all net royalties payable to him by the defendant on said device, in consideration of "introducing Mr. MacCluney to the Kelsey-Hayes Wheel Company and in persuading that company to undertake the manufacture and sale of the device." She entered her appearance by counsel but took no further part in these proceedings.

4. On or about February 3, 1945 a war contract (hereinafter called the Government Contract) was entered into by and between the United States of America and French and Hecht, Inc., wholly-owned subsidiary of Kelsey-Hayes Wheel Company, for the manufacture of 157,380 pelican hooks for the Government at a unit price of $3.74 each. The contract contained a proviso for its termination at any time for the convenience of the Government.

5. Performance of the Government Contract was begun immediately upon its execution and continued until on or about August 22, 1945 at which time the Government gave defendant notice of termination of the contract upon cessation of hostilities "for the best interests of the Government" and defendant, in pursuance of such notice, thereupon discontinued all work in connection with the manufacture of the pelican hooks.

6. Prior to termination of the Government Contract a total of 7,720 pelican hooks was completed and delivered to the Government for which it paid defendant $28,842.80, and defendant, in turn, paid ten percent (10%) of this amount, or $2,887.28, to plaintiff in accordance with its agreement with plaintiff to pay such percentage on all net sales derived from the sale of said pelican hooks.

7. Plaintiff was also employed by defendant during the period when such pelican hooks were being manufactured, for the purpose of assisting in the development of his invention, and was paid $7,369.45 by defendant as total compensation for such services.

8. The Government effected a settlement with defendant and its subsidiary in respect of its termination costs as follows:

| | | | |
|---|---|---:|---:|
| (a) | Raw materials and parts in process of | | $64,662.92 |
| (b) | Labor expended of | | 5,800.25 |
| (c) | Indirect factory expense of | | 32,417.50 |
| (d) | Dies, jigs and fixtures of | | 56,031.44 |
| (e) | Miscellaneous costs: | | |
| | Royalties paid to Plaintiff | $2,887.28 | |
| | Salary paid to Plaintiff | 7,369.45 | |
| | Rent | 702.27 | |
| | Engineering and related expense | 32,551.32 | 43,510.32 |
| | | | $202,422.43 |
| | Less: Completed hooks paid for prior to termination | | 28,872.80 |
| | Balance | | $173,549.65 |
| (f) | Settlement expenses, claims of sub-contractors, interest, etc. | | 20,193.14 |
| (g) | Profit | | 5,839.12 |
| | Total | | $199,581.89 |
| | Less: Disposal credits | | 7,625.67 |
| | Net | | $191,956.22 |

which includes an item of profit of ten percent (10%), or $5839.12, paid to the defendant on "in process items only", the cost of which amounted to $58,391.20, as evidenced by letter of French and Hecht, Inc. to Inspector of Naval Material, dated June 5, 1946. The above figures will be referred to herein as the Termination Inventory.

9. Subsequent to the termination of the Government Contract and in accordance with directions or approval of the Government, all of the tangible items included in the Termination Inventory were disposed of by the defendant, and the sum of $7,625.-67 received therefor is set forth in the Termination Inventory as "disposal credits".

10. Plaintiff filed his complaint in two counts and later amended his complaint by adding a third count. In the first count he claims damages for breach of contract based on ten percent (10%) of $588,601.20, the total amount which was to be paid by the Government, had contract been completed, the plaintiff charging defendant with unnecessary delay and negligence in the manufacture of the pelican hooks. In the second count he claims royalties of ten percent (10%) on the total sum which the Government agreed to pay defendant claiming the contract amounted to a net sale of all hooks contracted for. In the third count he claims a royalty of ten percent (10%) on partially completed pelican hooks on hand at the time of termination, claiming defendants were paid for such partially completed pelican hooks at the time of termination. The first count was dismissed on stipulation since the institution of this suit, and trial by jury was waived in the actions based on counts two and three.

11. Plaintiff claims:

(a) That the contract entered into between defendant and the Government for the manufacture of 157,380 pelican hooks, whether delivered or not, amounted to a sale of this number of pelican hooks, and that plaintiff is entitled to ten percent (10%) royalties on the amount paid or contracted to be paid by the Government to

defendant for the total amount of pelican hooks contracted for; or, in the alternative.

(b) That defendant be required to pay plaintiff a royalty of ten percent (10%) of the amount of the Termination Inventory which included partially-completed pelican hooks as disclosed by the termination claim presented by the defendant to the United States.

Plaintiff also requests the court to determine the share of Virginia Hatch in the royalties to be recovered by plaintiff in this action and to require her to reimburse plaintiff out of such share for her proportionate amount of the expenses incurred in bringing this suit.

12. In support of his contention that he is entitled to ten percent (10%) of the Termination Inventory under his agreement with defendant, less the $2,887.28 previously received by him for completed pelican hooks sold and delivered by defendant to the Government, plaintiff advances the fact that at the time the Government terminated the contract defendant had on hand the following completed parts to be used in assembling and completing the manufacture of his patented device:

13. Plaintiff also contends that, by the settlement agreement, the United States Government paid defendant for the Termination Inventory which included raw materials, purchased parts, sub-contract claims, indirect factory expenses, general and administrative expenses, work in process, tools, jigs, dies, and fixtures, and for all work performed or partially performed toward completion of said contract, together with a profit based upon the percentage of completion of the contract, and that this transaction constituted a sale of completed and partially-completed pelican hooks to the Government.

14. The court has adopted the partial statement of facts as stipulated by counsel, the remaining facts herein having been found on the basis of documentary evidence and testimony of one witness for defendant, who was the only witness sworn at the trial.

Conclusions of Law.

1. In determining the rights, duties, obligations, and relations of the parties hereto, reference must be had to all three contracts relied on by plaintiff as establishing his right to a judgment in his favor:

| Number | Description | Number Required in Hook | Number on Hand |
|---|---|---|---|
| P.B. 3805 | Latch Hook Forging | 1 | — 0 —* |
| A.P. 3806 | Latch Hook Pin | 1 | 48,445 |
| A.P. 3809 | Latch Handle Hook Pin | 1 | 121,336 |
| A.P. 3810 | Latch Handle & Slide Plate Pin | 1 | 127,683 |
| A.P. 3812 | Latch Link Pin | 1 | 25,512 |
| A.P. 3813 | Latch Hook Stop Pin | 1 | 133,918 |
| B.P. 4510 | Latch Plate | 2 | 420 |
| B.P. 3808 | Latch Handle | 1 | 2,835 |
| B.S. 4511 | Latch Link | 1 | 1,616 |
| C.A. 3974 | Assembly | 1 | 1,742 |
| | Parts in Process But Manufacture Incomplete | | |
| C.A. 3804 | Old Style Plates (obsolete) | 1 | 2,305 |
| B.P. 3808 | Latch Handle (various stages) | 1 | 29,136 |
| B.S. 4511 | Latch Link (various stages) | 1 | 18,584 |

* 7,300 rough forgings for this piece were on hand at time of termination. These required manufacturing operations (drilling and champering both sides) before they could be used in a hook.

a) The contract for license and royalties between plaintiff and the defendant,

b) The contract between defendant and the Government for the manufacture of the pelican hooks, and

c) The Settlement Agreement between the Government and the defendant's wholly-owned subsidiary, French and Hecht, Inc.

2. By the terms of the contract between plaintiff and defendant, plaintiff, as inventor of the pelican hook, agreed "to give Kelsey Hayes Wheel Co. and its subsidiaries exclusive manufacturing and selling rights * * *" and "Kelsey Hayes Wheel Company agree to pay you (plaintiff) ten percent (10%) on all net sales derived from the sale of said pelican hooks." The quoted portions of this agreement are important in relation to plaintiff's claim. The term "net sales" is not further defined in the agreement itself.

3. Pertinent provisions of the Government Contract are the following:

a) Section 1, which requires defendant to "furnish and deliver all the articles and perform all the services as set forth in the attached schedule, for the prices stated therein."

b) Section 4, which provides that "except as otherwise provided in this contract, upon submission of properly certified invoices or vouchers the contractor shall be paid the contract prices for articles delivered and accepted or services rendered."

c) Section 6, under which the Government reserves the right of inspection of materials for workmanship after delivery and the rejection of same if found defective or not in accordance with specifications.

d) Section 16, which provides for:

(1) Assignment by the contractor to the Government of all the right, title and interest of the contractor under the orders or sub-contracts so terminated,

(2) Settlement of claims arising out of such termination of orders or sub-contracts with the approval or ratification of the contracting officer,

(3) Transfer of title and delivery to the Government in the manner, to the extent, and at the time directed by the contracting officer, of the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced as a part of, or required in respect of, the performance of the work terminated in the notice of termination,

(4) Transfer to the Government of plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government, and

(5) Use by the contractor of its best efforts to sell in the manner, to the extent, at the time, and at the price or prices directed or authorized by the contracting government officer, of any property.

4. The Settlement Agreement following termination of the contract was made under the terms of the Government Contract and the provisions of the Contract Settlement Act of 1944, 41 U.S.C.A. §§ 101 to 125. The general purpose of Section 106(d, e) of this Act and Section 16 of the Government Contract is to reimburse the contractor for his proper costs and to allow such profit on the preparations made for work done for the terminated portion of the contract as is reasonable under the circumstances, but not to pay for work not done, or to pay profits to the contractor which would have accrued had the contract not been terminated.

5. In considering, then, the contract between plaintiff and defendant and ascertaining the intention of the parties to it and the meaning of the contract, the language used therein must be given its ordinary meaning. The court cannot read into it any additional obligations of or benefits to either party than its terms provide.

6. This contract is, in effect, a license to defendant for the manufacture and sale of pelican hooks under plaintiff's invention. While the rights given to defendant by plaintiff under the contract are "manufacturing and selling rights," the ten percent (10%) to be paid by defendant to plaintiff under the contract is confined and restricted to "all net sales derived from the sale of said pelican hooks." It is obvious that defendant did not agree to pay ten percent

(10%) to plaintiff on all hooks it manufactured, but only on those it actually sold as pelican hooks. The term "net sales" as used in the context of the contract must be construed to mean the net receipts from the sales of pelican hooks.

7. The contract between defendant and the Government is an undertaking and agreement by defendant to manufacture pelican hooks and to sell the manufactured hooks to the Government. Under its terms the contractor was required to ship and deliver completed articles at the place designated by the Government, but the Government had a right to inspect them and to either accept or reject them before paying the contract price.

8. The usual and ordinary meaning applied to the term "net sales" is a delivery by the seller and acceptance by the buyer. In view of the Government's undoubted right under its contract with defendant to inspect the hooks delivered by defendant, before accepting same, "net sales" could mean only the number of hooks accepted by the Government after inspection and after rejection of any which did not meet the specifications. The Government would, therefore, pay only for the number of completely assembled hooks it accepted which conformed to specifications. That ultimate amount would constitute the net sales. Inspection and acceptance was a condition precedent to payment.

9. "Net sales" can also be construed to mean the amount realized from the sale of delivered, inspected, and accepted pelican hooks, after deducting all charges and costs necessarily made in the process of manufacturing them. These deductions, charges, and costs are itemized in the Termination Inventory. If, as plaintiff contends, the Termination Inventory and Settlement Agreement made by defendant with the Government amounts to a "sale of pelican hooks to the Government, then, necessarily, deduction would have to be made for all the charges and costs, reimbursement for which was allowed to defendant by the Government, and there would remain only the item of profit of $5,839.12. But this item of profit was allowed defendant by the Government under the terms and conditions of the Government Contract providing for the method of settlement of that contract when the Government served notice of termination of the contract on defendant. The allowance of a profit to the defendant was not derived from a "sale" of pelican hooks, and, therefore, plaintiff would not be entitled to a payment of royalty thereon. Plaintiff does not claim a royalty on defendant's profit item.

10. It is true that at the time of the termination of the contract there were 1742 completed hooks and others partially completed, but no use was made of them either by defendant or by the Government, nor is there any evidence that the Government paid defendant in the Termination Settlement for pelican hooks as such, other than as "in process items." The hooks, or any parts thereof, which defendant had on hand at the time of receiving notice of termination of the Government Contract were not delivered to, nor were they inspected or accepted by the Government in any sense as completed and acceptable pelican hooks under the conditions and specifications of the Government Contract. Nor were they packaged, boxed, or shipped, as required by the specifications attached to the Government Contract.

11. Under the terms of the Settlement Agreement, authorized by Section 16 of the Government Contract, defendant assigned its rights to the Termination Inventory to the Government, following which, under order and authority of the Government, defendant disposed of the Termination Inventory and the completed and uncompleted hooks on hand at the time the termination notice was received were scrapped. The Government received credit for disposal of raw materials and furnaces, as well as the sum of $7,625.67 received by defendant on the sale and scrapping of the remainder of the Termination inventory.

12. There was no agreement, mutual understanding, or any reasonable inference from established facts, that plaintiff should receive royalties for partially completed pelican hooks. Payment of the ten percent (10%) to him under his license to defendant to manufacture the article were

limited by the express agreement in his contract with defendant to be paid only on the "net sales" of the article, and not on any hooks which were manufactured but not sold or on partially-completed hooks referred to in the Termination Inventory.

■ 13. The Uniform Sales Act defines a "contract to sell" goods as a contract whereby the seller agrees to transfer the property and goods to the buyer for a consideration of the price. It is a present undertaking to do something in the future. A "sale" of goods, on the other hand, is defined as an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price. Sec. 19.241, M.S.A. Comp.Laws 1948, § 440.1. A sale imports the transfer of the title or interest in a thing.

14. There was no such transfer of title or interest by defendant to the Government of the entire amount of pelican hooks contracted for, except the 7,720 hooks completed, delivered, inspected, and accepted, as to constitute a sale to the Government of the 157,380 pelican hooks under the Government Contract with defendant. Nor can the Settlement Agreement be, in any sense, construed as a sale of completed or partially-completed pelican hooks to the Government under the terms and conditions of the Government Contract, although, technically, there was a transfer of title of the Termination Inventory to the Government. The technical transfer of title of this Termination Inventory to the Government, made pursuant to Section 16 of the Government Contract, cannot be construed as a "net sale" of pelican hooks to the Government under either plaintiff's contract with defendant or defendant's contract with the Government. Nor was the amount received by defendant from the Government by the Termination terms of that contract an amount "derived from the sale of pelican hooks."

■ 15. The contract for the manufacture and sale by defendant of pelican hooks terminated the only outlet for the sale and use of these hooks. The provision in the Government Contract for termination of the work on these hooks may be likened to an anticipatory breach of contract. Both contracting parties knew that this was a war contract and would probably be terminated before fully completed, upon cessation of hostilities, and that from then on the rights of the contracting parties would be determined under other provisions of the same contract. Defendant expended approximately $200,000 in performing its obligation to manufacture the total amount of pelican hooks contracted for by the Government. Cessation of hostilities terminated the contract, however, and defendant made a settlement of its investment and its undertakings herein set forth. Such termination settlement was not a sale of pelican hooks, so as to entitle plaintiff to royalty under his contract with defendant.

16. It is reasonable to infer from all the circumstances entering into this transaction that defendant, as manufacturer, anticipated a sudden termination of its contract with the Government and that upon termination it might have on hand a large number of either completed hooks which were not yet sold, or many in process of manufacture, including purchased parts used in the final assembly of the hooks, and that for this reason it protected itself in its contract with plaintiff by undertaking to pay him a royalty on the "net sale" only of the pelican hooks, and not upon the number manufactured.

■ 17. In 37 Words and Phrases, Perm Ed., under Royalty, page 809, and Tesra Co. v. Holland Furnace Company, 6 Cir., 73 F.2d 553, 554, the term "royalty" is defined as "payment proportionate to the use of a patented device." Plaintiff's contract did not specify that he was to be paid a royalty on each pelican hook manufactured by defendant, nor did it specify that he was to receive a royalty on the use of plaintiff's device if the manufactured device was not sold, but it did specify that he was to be paid a royalty only on net sales of the manufactured device, and this means sales in the usual and ordinary course of business under the terms of the Government Contract.

18. Plaintiff has failed to establish his right to the payment of a royalty either

under the terms of his own contract with defendant, on the entire cost of the 157,380 pelican hooks contracted to be manufactured and sold by defendant to the Government, or on the amount which defendant received from the Government under the termination provisions of the Government Contract and Settlement Agreement.

19. A judgment of no cause of action will, therefore, be entered in favor of the defendant.