## MacCLUNEY v. KELSEY–HAYES WHEEL CO. et al.

### No. 11171.

United States Court of Appeals
Sixth Circuit.

Jan. 31, 1951.

Daniel Hodgman, Detroit, Mich., Daniel Hodgman, Detroit, Mich., on brief, for appellant.

Alfred W. Massnick, Detroit, Mich., A. Hilliard Williams, Alfred W. Massnick, Detroit, Mich., on brief; Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., of counsel, for appellee.

Before HICKS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The appellant, Robert MacCluney, inventor of a patented "pelican hook" for fastening heavy objects on ships at sea and on moving vehicles, was introduced to the appellee Kelsey-Hayes Wheel Company by Mrs. Virginia Hatch for the purpose of persuading that company to undertake the manufacture and sale of the patented device. She succeeded and, in anticipation of the execution of a contract between appellant and the appellee corporation and before it was executed by

letter, MacCluney assigned to Mrs. Hatch, for her services in procuring the contract, one-third of all the net royalties which would be payable to him thereunder. While interested in the outcome of this litigation, Mrs. Hatch has not participated in the proceedings but has merely entered her appearance and is nominally in the position of an appellee.

The contract on which this action was brought is in the form of a letter dated and signed by appellee on July 18, 1944, and accepted by appellant, by signature on the letter, two days later. The letter-contract confirmed a manufacturing and selling agreement between the parties, whereby the inventor gave the appellee corporation and its subsidiaries exclusive manufacturing and selling rights on MacCluney pelican hooks "in so far as any present or future patents may be concerned for both domestic and export distribution." Kelsey-Hayes Wheel Company agreed to pay MacCluney ten percent on "all net sales derived from the sale of said pelican hooks." The expression *"net sales"* is highly important.

The district court filed succinct findings of fact which are supported by stipulation of the attorneys, by documentary exhibits, and by the testimony of the only witness introduced. From these findings, it appears that, as of February 3, 1945, the United States by a duly authorized purchasing officer of the Navy Department entered into a war supplies contract with French and Hecht, Inc., a wholly owned subsidiary of the appellee Kelsey-Hayes Wheel Company, for the furnishing and delivery by the contractor upon specified terms and conditions of 157,380 pelican hooks for the government at the price of $3.74 for each of such articles. The contract was terminable at any time by the government upon prescribed notice.

Immediately after its execution, performance of the contract with the Navy Department was begun and was continued until August 22, 1945, when, hostilities having ceased, the government served appropriate notice of its termination. Upon receipt of such notice, the contractor ceased all work in connection with the manufacture of pelican hooks. Before the war contract was terminated by notice, the contractor had completed and delivered to the government only 7,720 pelican hooks, for which payment of $28,842.80 was made at the contract price, and the full agreed royalty of ten percent thereon amounting to $2,887.28 was paid by appellee to MacCluney. In addition to the royalty which appellant was to receive on all net sales of pelican hooks under his contract with Kelsey-Hayes Wheel Company, he was also employed by it to assist in the development of his invention while the pelican hooks were being manufactured and was paid $7,369.45 for such services.

After termination notice had been given, a settlement agreement was reached in conformity with appellee's contract with the government. The government paid the contractor for the raw material and parts in process of manufacture, for labor expended, factory expenses, for dies, jigs and fixtures (in the amount of $56,031.44), and for miscellaneous costs, including rent, engineering and related expenses, the $2,887.28 royalties paid MacCluney and the $7,369.45 salary paid him, less the deduction of $28,872.80 for completed pelican hooks paid for prior to termination of the contract. This totaled $173,549.65 to which was added a credit to the contractor for settlement expenses, claims of subcontractors, interest, etc., of $20,193.14, and a profit of $5,839.12 on items *in process only*, the cost of which amounted to $58,391.20. This brought the total allowance up to $199,581.89, from which was deducted the sum of $7,625.67 as a disposal credit, being the amount received by the contractor on the sale and scrapping of the remainder of the termination inventory. Thus, the net amount paid to the contractor was $191,956.22.

Upon termination, the appellee company had on hand raw materials, work in process, and certain assemblies and parts in process. The completed parts and those in process were scrapped and either sold on the open market as scrap, or remelted in appellee's factory as scrap. After the termination notice, none of the completed or partially

completed pelican hooks was either sold or used as such. The Navy had no use for them and there was no market for them elsewhere.

MacCluney filed a complaint against Kelsey-Hayes Wheel Company which, when amended after one count had been withdrawn, left two counts in one of which he claimed damages in the amount of $60,000 on the theory that the appellee made a sale to the United States in the amount of $600,000 "due in the year 1945 or 1946" derived from the sale of his invention, whereon he is entitled to ten percent royalty. In the other count, he claimed that Kelsey-Hayes Wheel Company should be required to pay him a royalty of ten percent of the amount of the "termination inventory constituting partially completed pelican hooks as disclosed by its termination claim presented to the United States." He bases this latter claim upon the proposition that the settlement transactions beween the government and the appellee "constituted a sale of partially completed pelican hooks to the United States of America." Appellant prayed further for a determination of the share of Virginia Hatch in the royalties to be recovered by him and to require her to reimburse him from such share for her proportionate amount of his expenses in this litigation.

The gist of MacCluney's contention is that, by the settlement agreement, the government paid the appellee company for the termination inventory which included raw materials, purchased parts, sub-contract claims, indirect factory expenses, general and administrative expenses, work in process, tools, jigs, dies, and fixtures, and for all work performed or partially performed toward completion of the contract together with a profit based upon the percentage of completion and that *the entire transaction constituted a sale to the government of completed and partially completed pelican hooks.*

We think his position is untenable and that the district court properly entered judgment that MacCluney has no cause of action against Kelsey-Hayes Wheel Company.

For the exclusive manufacturing and selling rights of MacCluney's patented pelican hooks, Kelsey-Hayes Wheel Company agreed to pay him a ten percent royalty on all *net sales.* There was no agreement to pay the royalty on all pelican hooks *manufactured.* The contract between the government and the appellee corporation's subsidiary reserved to the government the right to inspect and test the pelican hooks and to reject any of them if defective in material or workmanship, or if otherwise failing to meet the specifications of the contract. The government was under no obligation to pay at the contract price for pelican hooks, as such, unless accepted by it. The contractor was obligated to ship and deliver the accepted articles as directed by the government. Inspection and acceptance by the government was undoubtedly a condition precedent to payment of the contract price for each pelican hook manufactured by the appellee.

As found by the district court, while at the time the government notified appellee's subsidiary of termination of its contract that corporation had on hand some 1742 completed pelican hooks and others partially completed, no use was ever made of them either by appellee or by the government. There is no showing that the government, in the termination settlement, agreed to pay appellee for completed pelican hooks on hand and undelivered, other than as items "in process." The pelican hooks which appellee had on hand when it received the government's notice of termination had not been inspected or accepted, and had not been and never were delivered to the government. The manufactured articles had not been packaged, boxed, or shipped as required by specifications attached to the government contract.

As is customary in supply purchasing contracts with departments of the government in time of war, the requirements made upon the contractor were very rigid. As an eminent jurist once declared, one who deals with the government must turn square corners. We think that the contractor in the instant case dealt squarely with the government in not even attempting to load

into the settlement royalties on the uninspected and unaccepted pelican hooks which it had manufactured and had on hand at the time the government exercised its undoubted right to terminate the contract. Under the contract as written, the inventor assumed the hazard of what occurred and has not fared badly, after all, in that he received his agreed royalties on manufactured pelican hooks inspected and accepted by the government and, in addition to this, received from the appellee company a substantial salary for his personal services during the period of manufacture.

The profit allowed appellee by the termination agreement was not based upon *the sale* of pelican hooks and, therefore, appellant would not, under his contract with appellee, be entitled to participate therein. The contractor was merely reimbursed for its proper costs and allowed a relatively small profit for the work done on unaccepted pelican hooks. This was reasonable in the circumstances. The contractor was not allowed profits which would have accrued on the material manufactured if the contract had not been terminated.

Under the terms of the settlement agreement, pursuant to section sixteen of the contract with the government, appellee assigned its rights to the termination inventory to the government and under the government's direction and authority disposed of the termination inventory; and the completed and uncompleted pelican hooks on hand at the time the termination notice was received were *scrapped*. The government was allowed proper credit for the disposal of raw materials and other items in the inventory and was credited with the $7,625.67 received by appellee from the sale and scrapping of the termination inventory. We find from the record no such transfer of title or interest by appellee to the government of unaccepted completed or partially completed pelican hooks as would constitute a sale of them to the government.

To construe his royalty contract as appellant would have us construe it would require us to re-write the contract. That

is beyond our province. No case has been cited remotely indicating that appellant is entitled to recover royalties in circumstances anywise resembling those encountered here.

The judgment of the district court is affirmed.