**VELSICOL CHEMICAL CORPORATION,**
an Illinois corporation, Plaintiff,

v.

**HOOKER CHEMICAL CORPORATION,**
a New York corporation, Defendant.

No. 63 C 82.

United States District Court
N. D. Illinois, E. D.

June 30, 1964.

Philip W. Tone, Donald R. Harris, James M. Parker, Chicago, Ill., for plaintiff, Raymond, Mayer, Jenner & Block, Gary, Parker Juettner & Cullinan, Chicago, Ill., of counsel.

Frank A. Wollaeger, Chicago, Ill., for defendant, McBride, Baker, Wienke & Schlosser, Chicago, Ill., MacFarland & Colley, Lon P. MacFarland, Columbia, Tenn., Laurence & Laurence, Dean Laurence, Herbert I. Sherman, Washington, D. C., of counsel.

JULIUS J. HOFFMAN, District Judge.

In this action, plaintiff, Velsicol Chemical Corporation, charges defendant, Hooker Chemical Corporation, with breach of a licensing agreement regarding United States Letters Patent 2,606,-910. Plaintiff seeks damages, alleging that defendant is liable to plaintiff under the agreement for non-payment of royalties; an order that defendant permit an examination of its records by a certified public accountant in accordance with the provisions of the agreement; an order for an accounting for all royalties due plaintiff from defendant; and a declaratory judgment that from and after the effective date of termination of the agreement, defendant has no right to sell certain chemical products in any foreign country in which there is an applicable "Licensed Patent Right of Velsicol," as defined in the agreement, outstanding under the laws of that country.

This court has jurisdiction of the cause under 28 U.S.C. § 1332. Plaintiff is a corporation incorporated under the laws of the State of Illinois and has its principal place of business in Chicago, Illinois. Defendant is a corporation incorporated under the laws of the State of New York and has its principal place of business in New York City. Defendant is licensed to do business and is doing business in the State of Illinois. The amount in controversy exceeds, exclusive of interest and costs, the sum of $10,000.

Plaintiff's predecessor in interest, Velsicol Corporation, and Hooker Electrochemical Company, of which defendant is the successor and assignee, entered into a contract effective March 1, 1951. Defendant has succeeded to all the rights and obligations of Hooker Electrochemical Company under the contract. As recited in the contract, both parties had been engaged in research concerning the making of derivatives of the compound hexachlorocylopentadiene, called in the contract "C$_{56}$," and also called "hex" by the parties during these proceedings. Both parties held patents as a result of such research, and each desired to obtain a license under any such patents held or subsequently acquired during the life of the contract by the other; therefore, in the contract, the parties cross-licensed their respective patents claiming "derivatives of C$_{56}$."

The agreement, as amended subsequent to its effective date, continued in full force and effect until May 31, 1962, when it was terminated as to future operations in accordance with Article 7(B) of the contract, by virtue of a letter from defendant to plaintiff dated February 26, 1962. In defendant's termination letter, defendant asserted its right, pursuant to the provisions of Article 7, paragraphs (C) and (D), of the contract, to retain a license to continue to use the process claimed under plaintiff's United States Letters Patent 2,606,910, referred to hereinafter as the chlorendic patent. This patent claims a process for making the compound chlorendic anhydride, and the compound itself. Chlorendic anhydride is a Diels-Alder adduct of "hex" and maleic anhydride.

During the time the contract was in effect, and subsequently, defendant has made and sold chlorendic anhydride; chlorendic acid, a compound produced by adding a molecule of water to the chlorendic anhydride; and certain other products which are made using chlorendic anhydride or acid as an ingredient, principally certain resins in a line of polyester resins on which defendant holds patents. These patents are United States Patents No. 2,783,215 and No. 2,-779,701. Hooker markets these products under the names Het Anhydride (chlorendic anhydride), Het Acid (chlorendic acid); and Hetron Resins or Hetrons (polyester resins).

Defendant has paid plaintiff royalties under the contract based upon the net sales price of the chlorendic anhydride and chlorendic acid made and sold by defendant. With regard to the hetron resins, however, defendant has not paid royalties based upon the net sales price of the resins it has made and sold, but rather has paid on the basis of the

amount of chlorendic anhydride or acid used in making the resins.

The proper royalty basis, under the contract, regarding the hetron resins has been a matter of dispute between the parties, off and on, since October, 1952. At a meeting of Velsicol and Hooker representatives held then, Mr. Babcock of Hooker stated that Hooker was not only selling chlorendic anhydride and acid, but also was using these compounds to make other products. He suggested that a fixed fee be established for intra-plant transfers of chlorendic. Mr. Lorant of Velsicol replied that the contract provided for a royalty based upon the final product and provided for no alternative. The matter was deferred for further study.

A series of negotiations followed, which resulted, at a meeting held on September 30, 1953, in a voluntary withdrawal by plaintiff of its demand for payment of royalties based upon the end product, "for the time being," or "during the development period." This withdrawal was made after Mr. Wilkin of Hooker had urged that plaintiff should bear a part of the development costs Hooker was incurring in its efforts to develop a market for chlorendic. Part of this effort, he said, involved demonstrating to the market the various uses of chlorendic, as in the hetron resins, but it was the primary purpose of Hooker to sell chlorendic and not the resins. Thus, he said, it would be to Velsicol's advantage, as well as Hooker's, if Velsicol helped to bear the development cost by not insisting upon the higher royalty basis.

From the time of this meeting until March 4, 1959, Velsicol accepted royalty payments from Hooker on the basis of the chlorendic used in making hetron resins. On that date, following an audit of Hooker's books made for Velsicol by Arthur Andersen and Company under the audit provisions of the contract, the dispute over the royalty basis resumed with a demand by Velsicol that Hooker make certain additional payments, including a payment of $130,400, the amount by which royalties would have been increased had they been computed on the basis of the end product rather than upon the "intermediate"—the chlorendic used in making the end product.

Following this demand, further negotiations ensued, but the parties failed to reach agreement on a settlement of the issue. Plaintiff then commenced this action, the principal count of which concerns the question of the proper royalty basis under the contract where defendant uses chlorendic it produces in the manufacture of other products.

## COUNT I: THE ROYALTY BASIS FOR CHLORENDIC USED BY DEFENDANT IN THE PRODUCTION OF OTHER PRODUCTS

In Count I of the complaint, plaintiff asserts a right to royalty payments based upon the end product covering the entire life of the contract, and subsequent to its termination. In its post-trial brief, however, plaintiff stated that it elected not to claim royalties on that basis for the "moratorium period" commencing with the September 30, 1953 meeting—in effect, from the effective date of the contract—and ending on March 30, 1959. On the latter date, plaintiff asserts, plaintiff's renewed demand on the defendant for royalties based upon the end product terminated its prior voluntary concession to accept royalties based upon the intermediate.

Two principal issues regarding Count I remain in the case. The first arises with Hooker's defense that the contract calls for royalties only on the intermediate and not on the end product; the second, with Hooker's affirmative defenses that even if plaintiff's interpretation of the contract is correct, there has been an accord and satisfaction as to any obligation of defendant to pay royalties based upon the end product, for those periods for which royalty payments by defendant have been accepted by plaintiff, and that the doctrine of laches bars plaintiff from demanding royalties based upon the end product for subsequent periods during the life of the chlorendic patent.

Because I find, in accordance with defendant's interpretation of the contract, that the contract does not obligate defendant to pay royalties on the basis of the end product, it is unnecessary to consider at great length the affirmative defenses. It is appropriate to state, however, that the evidence does not support the contentions made by Hooker with regard to these defenses.

## The Defenses of Accord and Satisfaction and Laches

Defendant first maintains that an accord was reached at the September 30, 1953 meeting, with Velsicol withdrawing its demand for royalty payments based upon the end product without indicating that the withdrawal was "for the time being" or "during the development period." The evidence, however, establishes the contrary. Although Mr. Wilkin of Hooker, who attended this meeting, testified that the Velsicol concession regarding the royalty basis was made without any time limitation, and a memorandum signed by Mr. Wilkin and Mr. Babcock of Hooker and addressed to other Hooker personnel reported the concession without indicating that it was made with any limitations, Mr. Wilkin's recollection of the events was not as clear and complete as that of the Velsicol representatives at that meeting who testified regarding what transpired. The Hooker memorandum, admitted into evidence for a limited purpose, is not entitled to much weight on this question.

Defendant further maintains, however, that even if plaintiff's version of the meeting is accepted, an accord was reached at the meeting, and that the "temporary concession" of Velsicol was supported by consideration. The accord, therefore, had the legal effect, defendant argues, of an agreement which could be terminated only by the occurrence of a condition subsequent, i. e., the end of the "development period." The consideration, defendant asserts, was *plaintiff's* forbearance from bringing a law suit in 1953 to claim royalties based upon the end product; but it is too plain to require either discussion or citation of authority that *Velsicol's* forbearance does not amount to consideration from *Hooker*.

Further consideration, defendant states, was Hooker's undertaking to develop a market for chlorendic, which would redound to the benefit of Velsicol as well as Hooker. Hooker, however, was not obligated to develop this market by virtue of what transpired at the meeting; consequently, no bilateral contract was made, with each party making a promise to the other. And, if it can be said that Hooker offered to develop a chlorendic market if, in return, Velsicol would share the development costs, defendant has not proved that it has performed its part of the unilateral "bargain." There is no evidence that Hooker has developed a market for chlorendic from which Velsicol has benefitted; rather, Hooker went into the resin business itself. Of course, Velsicol has "benefitted" from the royalty payments made by Hooker on the chlorendic Hooker uses in the resins; that this benefit cannot constitute consideration, however, is readily apparent—the entire dispute concerned Velsicol's insistence that if Hooker made resins from chlorendic, Hooker should pay on the resins. This "consideration," like Velsicol's forbearance from suing in 1953, moves from Velsicol and not from Hooker.

Finally, even if some sort of effective agreement was made, defendant has not shown, as it contends, that the "development period" is still going on. The term "development period" should be construed in the light most favorable to plaintiff, since it was defendant who asked plaintiff to share the development costs, and it is reasonable to conclude that such period ended when defendant began to show a profit on chlorendic in about 1958.

I find from the evidence that plaintiff made a voluntary concession, at the meeting in question, which it could withdraw at will. Cf. McKenzie v. Harrison, 120 N.Y. 260, 24 N.E. 458, 8 L.R.A. 257 (1890); Technical Equipment Corp. v. Montauk Garage Corp., 63 N.Y.S.2d

311 (Sup.Ct.1946); Auswin Realty Corp. v. Kirschbaum, 270 App.Div. 334, 59 N.Y.S.2d 824 (1946).

Defendant makes the additional argument, with respect to accord and satisfaction, that after plaintiff made its demand of March 4, 1959, plaintiff continued to accept royalty payments from defendant which it knew were based upon the intermediate rather than upon the end product. Such acceptance, defendant contends, constituted accord and satisfaction of the obligations these payments were meant to satisfy.

■■ The evidence establishes that subsequent to plaintiff's demand of March 4, 1959, its continued acceptance of royalty payments based upon the intermediate did not constitute accord and satisfaction. Plaintiff continued to demand royalties based upon the end product, it refused to accept the one check that was sent with a statement that the payment was "in full settlement of all outstanding royalties * * * on C-56 derivatives," until the check was sent without the accompanying statement, and no payment was tendered by plaintiff and accepted by defendant as accord and satisfaction of any further debt owing.[1] The payments made after March 4, 1959, were thus on account and not in satisfaction of any record reached by the parties regarding the royalty basis. See Willard Van Dyke Productions Inc. v. Eastman Kodak Co., 16 A.D. 2d 336, 228 N.Y.S.2d 330, 336 (1962), affirmed, 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693 (1963); Hudson v. Yonkers Fruit Co., 258 N.Y. 168, 171, 179 N.E. 373, 374, 80 A.L.R. 1052 (1932); LaRoe v. Sugar Loaf Dairy Co., 180 N.Y. 367, 73 N.E. 61, 62 (N.Y. 1905); Hempstead Bus Corp. v. Carcards, Inc., 11 Misc.2d 23, 169 N.Y.S.2d 823 (1957); Famous Music Corp. v. Seeco Records, Inc., 201 F.Supp. 560 (S.D.N.Y. 1961). See also Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 176 F.2d 73 (10th Cir. 1949), cert. denied, 338 U.S. 943, 70 S.Ct. 429, 94 L. Ed. 581 (1950).

■ Defendant presents an extended argument regarding the defense of laches, based upon plaintiff's acceptance of royalty payments on the intermediate from 1952 to 1959, plaintiff's delay in bringing this action until 1963, and defendant's considerable investment in its hetron resins and other chlorendic-related products made during this period to its "detriment" and in reliance upon plaintiff's actions. Suffice it to say on this issue that plaintiff's 1953 concession was voluntary and terminable at will; plaintiff continued to assert its interpre-

---

1. Defendant has submitted a post-trial memorandum arguing the admissibility of certain letters of transmittal sent to plaintiff along with three checks, which letters were not admitted into evidence at the trial. I am not persuaded by the authorities relied upon by defendant that the letters are admissible, and do not reverse my earlier ruling, but even if the letters were to be considered as evidence, they do not show accord and satisfaction. One letter stated that the checks were sent "representing royalty due you on our sales, samples, and use in other products of het acid, and sales of het anhydride for the period of June 1 through August 31, 1961 as per agreement." The other two letters used similar phrasing, one stating "as per agreement" and the other "as per license agreement dated March 1, 1951." Defendant has cited no cases showing that these terms effect an accord and satisfaction, where the accompanying payment is accepted. Under New York law, which the parties agree applies on this issue, where the amount due is in dispute and payment is submitted in full satisfaction of the obligation and accepted with that understanding, an accord and satisfaction results. E. g., Eames Vacuum Brake Co. v. Prosser, 157 N.Y. 289, 51 N.E. 986, 989 (1898); Hudson v. Yonkers Fruit Co., 258 N.Y. 168, 172, 179 N.E. 373, 375, 80 A.L.R. 1052 (1932). But the letters here in question do not say "in full settlement," do not imply that the checks are in full satisfaction of the obligation, and do not indicate that when plaintiff accepted the payments plaintiff understood or should have understood that the payments were in full settlement. Defendant knew that plaintiff was continuing to press its claim for royalties based upon the end product during the periods when these letters were sent and the checks retained.

tation of the royalty provisions of the contract when the subject was discussed between the parties during the "moratorium period," in 1956 or earlier, 1957, and 1958; defendant has not proved that it relied upon plaintiff's voluntary concession or its failure to demand royalties on the end product during the "moratorium period" when defendant made the hetron resin or other investments, or that it would not have expanded its business but for such conduct on the part of plaintiff; and defendant has failed to prove any detriment resulting from its expenditures in research and expansion of facilities. It appears, in fact, that defendant has benefitted from the moratorium period, and it does not appear that its ventures would be unprofitable if, from the end of that period, it were required to pay royalties on the end product.

Inasmuch as the affirmative defenses are not supported by. the evidence, determination must be made of the question whether the contract calls for royalty payments based upon the chlorendic used in the hetron resins or other products, or upon the end product.

*The Meaning of the Royalty Provision of the Contract*

The applicable royalty provision of the contract, Article 5(A), reads as follows:

"During the life of this Agreement, HOOKER shall pay VELSICOL as royalty under Article 4 hereof, five per cent (5%) of the Net Sales Price of all Derivatives of $C_{56}$ made and sold by HOOKER under the Licensed Patent Rights of VELSICOL."

Plaintiff contends that the hetron resins and other products made by defendant using chlorendic anhydride or acid as an ingredient are "Derivatives of $C_{56}$ made and sold by Hooker under the Licensed Patent Rights of Velsicol," and that, consequently, defendant must pay a 5% royalty on the net sales price of these products.

Defendant contends, first, that the products in question are not "Derivatives of $C_{56}$" as that term is used in the contract, and, second, that even if they are, they are not made and sold "under the Licensed Patent Rights of Velsicol," as that phrase is used in Article 5(A).

Much of the record in this case comprises testimony and exhibits regarding the meaning of the term "Derivatives of $C_{56}$." Plaintiff contends that such derivatives are any products made using "hex" as a starting or intermediate material, no matter how many steps follow after the introduction of hex into the compound. Defendant contends that only "first generation" or "P-1" derivatives of hex are meant, that is, only those compounds one step removed from that in which hex is introduced.

█ Although, in my view of Article 5(a), defendant must prevail no matter which interpretation of "Derivatives of $C_{56}$" is correct, I should nevertheless state that this term clearly is not limited to first generation, or P-1, derivatives, as defendant contends. Article 1 (F) defines this term to mean "products resulting from the use of $C_{56}$ as a starting or intermediate raw material." Surely a first-generation limitation would have been expressed in this definition had it been intended. That the parties did not, at the outset, intend any such limitation is evident, first, from the specific exclusion, in Article 4, of certain second-generation derivatives from the patents to be licensed to Hooker under the contract, and second, by the inclusion by both parties of second and higher generation derivatives in the original schedules, which are part of the agreement, itemizing the "Licensed Patent Rights" of the parties covered by the agreement. Thus, the contract was entered into by two parties who had been conducting research in products resulting from the use of "hex," both parties had patents or applications therefor covering products more than one generation removed from "hex," certain of such products were specifically excluded from the contract, and others were specifically included. The conclusion

seems inescapable that the contract is not limited as defendant contends.

I therefore find that the hetron resins and other products made by defendant using chlorendic as an ingredient are derivatives of $C_{56}$ as that term is used in the contract, because, as was clearly shown by plaintiff's expert witness, they are made with hex as the starting material, or as an intermediate material if hex is first produced from its components. Defendant's expert witness testified that hex was neither a starting nor an intermediate raw material in the production of the resins; rather, he said, chlorendic was the starting material. His definition of terms, however, varied considerably from the way in which they were obviously used in the contract. He used "starting material" to mean whatever material a given lab worker begins with in making a compound. Such a shifting definition would have no meaning in this contract; its elusiveness would likely render the agreement void for vagueness! Even if the resins are made in Hooker's resin plant with chlorendic used as the "starting material" in the expert's sense of the term, to make chlorendic one must either begin *with* hex or begin by *making* hex. Thus, *someone*, must use hex as a starting or intermediate raw material en route to the resins, and that *someone* does satisfies the uncomplicated contract definition of "derivatives of $C_{56}$."

The remaining issue, then, is whether the hetron resins and similar products are "Derivatives of $C_{56}$ made and sold by Hooker *under the Licensed Patent Rights of Velsicol.*" I find that these products are not made and sold by Hooker under the Licensed Patent Rights of Velsicol, within the meaning of the contract. The hetron resins are made and sold not under the Licensed Patent Rights of Velsicol, but under Hooker patents. Plaintiff contends that defendant could not make and sell the resins without violating Velsicol's chlorendic patent, if Hooker were not licensed thereunder. But, as defendant persuasively argues, it

could. Plaintiff correctly notes that, of course, if defendant were not licensed under the chlorendic patent, but nevertheless produced chlorendic and then used it in production of hetrons, defendant would infringe the chlorendic patent. But, likewise, if Hooker bought chlorendic from Velsicol or from one licensed under the chlorendic patent, Hooker could then use the chlorendic for any purpose, including resale. See Harshberger v. Tarrson, 87 F.Supp. 43, 45 (N. D.Ill.1949), affirmed, 184 F.2d 628 (7th Cir. 1950), and cases cited therein. See also Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp., 266 F. 71, 77–79 (2d Cir. 1920). Thus, it could also use the chlorendic for the manufacture of hetron resins, without infringing the chlorendic patent. The resins themselves are not equivalents of chlorendic, and they are not claimed in the chlorendic patent. (Nor has plaintiff shown that "Hetrofoams"—another product made by defendant from het acid—are equivalents of chlorendic.) And the fact that Hooker makes its own chlorendic, under license from Velsicol, does not mean that the *resins* are made *under* the chlorendic patent. It is the chlorendic anhydride and acid, not the hetron resins, that are made by Hooker "under the Licensed Patent Rights of Velsicol."

It should be noted that the chlorendic patent discloses that chlorendic anhydride can be used in making fire-resistant alkyd type resins. Hetron resins are "fire-resistent alkyd type" resins, as defendant's hetron patents show. But the chlorendic patent does not claim a process for making such resins, or the resins themselves. It merely foresees a certain potential use for chlorendic in making such resins. That it does so does not mean that the resins are made "under" the chlorendic patent or would infringe that patent, providing the chlorendic used to make the resins was made with license under the chlorendic patent or purchased from one properly licensed thereunder. The word "under" in Article 5(A) clearly means "under the claims of" the pat-

ents licensed, as can be seen by the use of the word in Article 2, describing the grant from Hooker to Velsicol. In Article 2, "Hooker grants to Velsicol a non-exclusive, non-assignable right and license *under* the Licensed Patent Rights of Hooker to use the inventions therein described and *claimed* * * *."

 To adopt plaintiff's position that royalty is to be paid on the end product rather than on the intermediate chlorendic, one must read the word "made" in Article 5(A) as meaning "Made [in whole or in part] * * * under the Licensed Patent Rights of Velsicol." As plaintiff argues, the parties were free to agree to such a provision. See, e. g., Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); American Optical Co. v. New Jersey Optical Co., 58 F.Supp. 601, 606 (D.Mass. 1944); Ohio Citizens Trust Co. v. Air-Way Elec. Appliance Corp., 56 F.Supp. 1010, 1012 (N.D.Ohio 1944); Ben Pearson, Inc. v. John Rust Co., 223 Ark. 697, 268 S.W.2d 893, 897, petition for cert. dismissed, 348 U.S. 853, 75 S.Ct. 60, 99 L.Ed. 672 (1954). But had they intended that royalty should be paid on the end product, that intent could have been expressed in unambiguous terms. See, e. g., the provisions involved in the last cited decisions. Moreover, such provisions are unusual. The contract provides that five per cent of Net Sales Price is to be paid "as royalty." Royalty is customarily defined as "payment proportionate to the use of a patented device." MacCluney v. Kelsey-Hayes Wheel Co., 87 F.Supp. 58, 64 (E.D.Mich.1949), affirmed, 186 F.2d 552 (6th Cir. 1951); Eastman Oil Well Survey Corp. v. Lane-Wells Co., 21 Cal.2d 872, 136 P.2d 564, 565 (1943). Payment by Hooker of five per cent on sales of the end product would be disproportionate to its use of the chlorendic license. Where a provision for disproportionate payment is not clearly spelled out in the contract, I consider that the court should not strain the language of the contract to find one. See Eastman Oil Well Survey Corp. v. Lane-Wells Co., *supra*; Williston & Thompson, Law of Contracts § 620 (rev. ed. 1938).

If we view the contract in the light most favorable to Velsicol, it still appears to me that Velsicol's construction of Article 5(A) is unreasonable. The only language that can be considered to support the Velsicol view occurs in Article 1(E), defining "Net Sales." That article reads, in pertinent part, as follows:

"The term 'Net Sales', as used herein, means the gross sale price at which a derivative of $C_{56}$ *made by the use of* any Licensed Patent Rights of HOOKER or VELSICOL is sold by a licensee party [less certain specified amounts]."

Although it is true, in a sense, that the hetron resins are "made by the use of" Velsicol's chlorendic patent, inasmuch as Hooker produces chlorendic en route to the resins, employment of this phrase in the definition of "Net Sales" does not compel the conclusion that royalties are to be paid, under the contract, on the end product. This phrase makes just as much sense in the context of the definition when viewed to mean made "under" the Licensed Patent Rights of the opposite party, as when viewed as Velsicol would construe it. The purpose of this definition is to set down the precise way in which "Net Sales" are to be computed, not to set down the products upon which royalties are to be paid. Article 5(A) performs the latter function. And, if Article 1(E) is interpreted as Velsicol contends, the language of Article 5(A) must be contorted to harmonize; if Article 5(A), however, is interpreted as Hooker contends, the language of Article 1(E) easily conforms in meaning.

A reading of the contract as a whole shows that the parties were entering into an ordinary license arrangement. The obvious object which the parties sought to achieve was the cross-licensing of their respective patents, with royalty payable by each for use of the *other's* patents and not for use of its *own*. If this were not

a cross-licensing contract, and Hooker held no patents on hex derivatives, Article 5(A) would clearly relate to sale of the licensed product. And if defendant, then, obtained a license from a third party to make hetron resins, palpably Hooker would not owe Velsicol five per cent on its resin sales. Compare New Wrinkle, Inc. v. John L. Armitage & Co., 238 F.2d 753 (3d Cir. 1956). That the agreement cross-licenses patents should not confuse the ordinary meaning of ordinary licensing terms to the point where they produce an extraordinary result.

The contract recites that each party is interested in obtaining a license under the patent rights of the other claiming derivatives of hex. Licensed Patent Rights of each party is defined as each patent and each application claiming derivatives of hex or methods of making the same held or acquired by that party during the life of the contract. Each party grants to the other party license to its inventions described and claimed in its Licensed Patent Rights. And each agrees to pay royalty on hex derivatives made and sold under the Licensed Patent Rights of the other. The symmetry and clear purpose of the contract viewed as a whole are distorted if we view the royalty provision as plaintiff would have it construed.

Plaintiff has stressed its contention that Article 5(A) provides for a royalty based upon sale of the end product and provides no alternative. I agree that this article spells out no alternative to payment based upon net sales price, but I do not agree that it follows that payment on the "end product" is contemplated. It seems apparent that in drafting this contract, the parties overlooked the possibility that one or the other

would produce a "derivative of $C_{56}$" in which a product covered by a patent of the opposite party would be used as an ingredient in another product. Consequently, the problem of what royalty basis should be employed for the resins is not easily solved, and neither Velsicol's nor Hooker's interpretation fits neatly into the language of Article 5(A). Velsicol's interpretation does violence to the word "under" used in that article. And Hooker's interpretation is somewhat difficult to conform to the provision that royalty is to be paid on "five per cent of the *Net Sales Price* of all Derivatives * * * *made and sold* by Hooker under the Licensed Patent Rights of Velsicol." [2] But, if the language of Article 5(A) must be "stretched" under either party's interpretation, it is better to stretch the language concerning "Net Sales Price" than that concerning "under the Licensed Patent Rights of Velsicol"; the latter words relate to a more fundamental aspect of the agreement than do the former. Moreover, the "Net Sales Price" language need not be stretched to interpret the article as providing for royalty based on the intermediate, an interpretation which, I think, does considerably less violence to the language of the provision than does Velsicol's. Although Hooker makes chlorendic and then transfers it to the resin plant, where the final product is manufactured, the fact is the chlorendic is made and ultimately sold by Hooker, albeit as an ingredient in the resins. It is mathematically possible to arrive at a percentage of net sales price of the resins attributable to the chlorendic, and so to pay royalty based upon the chlorendic "made and sold." The parties are in agreement on the manner in which royalty on the intermediate is to be computed

2. Defendant maintains that the term "Net Sales" is defined in the agreement, but the term "Net Sales *Price*" is not defined. Defendant contends that there can be a price without an actual sale of particular material, as the price or value can be determined by reference to the price at which other like material is sold. This line of reasoning does not fit the language of Article 5(A), however, which states

that Hooker shall pay as royalty five per cent of the net sales *price* of all derivatives "Made and *sold*." This language indicates that royalty under the contract is based upon actual sales price. As explained in the text, however, I nevertheless consider that the Net Sales Price language of this provision is consistent with my interpretation that royalty is to be based upon the intermediate chlorendic.

in the event it is found that the contract does not call for payment on the end product; consequently I need not make a finding upon this computation.[3]

 Thus, when it is considered that the Hooker interpretation is considerably more in harmony with the language of the contract than is Velsicol's, and in addition that the Velsicol interpretation calls for an unusual royalty, greater than that proportionate to the use of the patent rights granted by Velsicol to Hooker, it appears logical to find that the contract does not call for a royalty based upon sales of the end product, but rather calls for a royalty based upon the intermediate chlorendic used in production of the end product.

 A final point to be considered on this question concerns the royalties paid by Hooker on the chlorendic acid which it produces. Velsicol contends that because Hooker has consistently paid royalty based upon the chlorendic acid, rather than upon the chlorendic anhydride used therein, Hooker has in effect admitted that it owes royalty based upon the end product. The evidence establishes, however, and plaintiff agrees, that chlorendic acid is an equivalent of chlorendic anhydride. "It is hornbook law that a licensee must pay royalties not only on the invention disclosed in a patent but he must also pay royalties on whatever is sufficiently similar to that disclosure to constitute infringement of the licensed process or product." New Wrinkle, Inc. v. John L. Armitage & Co., 277 F.2d 409, 411 (1960). The het acid is made and sold "under" the Licensed Patent Rights of Velsicol. There is no contention, neither is there any proof, that the hetron resins are the equivalent of chlorendic anhydride; the evidence shows the contrary.

## COUNT III: THE ALBRIGHT & WILSON ISSUE

One issue raised in paragraphs 12 and 13 of the complaint affects the resolution of certain issues related to Count II; consequently it will be convenient next to consider those paragraphs of the complaint.

In Count III, paragraphs 12 and 13, plaintiff contends that defendant has artificially reduced the amount of royalty payable on chlorendic anhydride and acid through allegedly bad faith dealings with a certain foreign customer, Albright & Wilson, Ltd., which holds or held stock in defendant corporation. Plaintiff asserts that defendant has sold chlorendic to Albright & Wilson at a lower price than it charges other foreign customers, and then receives a six per cent royalty based upon the price at which Albright & Wilson resells the product or other products which the latter manufactures from chlorendic. Plaintiff claims it is entitled to treat the royalty received by defendant from Albright & Wilson as part of the net sales price of the het acid sold to that customer.

Plaintiff further asserts that the low price to Albright & Wilson has been used in computing a basis for other royalties, and that these other royalties should be adjusted accordingly.

The first question, then, is whether the royalty paid by Albright & Wilson to Hooker is an improper "kick-back" designed to avoid royalty payments by Hooker to Velsicol.

The exact nature of the arrangement between Hooker and Albright & Wilson has not been shown. Plaintiff's proof on this point consisted of testimony by Mr. Dean of Arthur Andersen & Company, who stated what certain Hooker representatives had told him about the ar-

---

3. As is shown in my consideration of Count II of the complaint, the parties agree that if payment on the end product is not called for by the contract, Hooker should pay on the basis of all chlorendic made and transferred to production of hetrons and other end products. Under this arrangement, the parties are in effect regarding

the chlorendic so transferred as chlorendic "sold," and royalties are computed on the basis of an average sales price of chlorendic. Whether this computation of royalties is what the contract means by "made and sold" is not an issue in this case.

rangement, as well as portions of the second, third, and fourth audit reports (Pl. Ex. 31, 32, and 33), which describe the arrangement as the auditors understood it.

Mr. Dean testified as follows:

"I was told that Hooker had licensed Albright & Wilson of England to produce and distribute hetrons and het products, and that Hooker had given them all of Europe as an exclusive territory. As part of this agreement, Albright & Wilson could purchase het acid at 37 cents a pound less a 5 per cent discount. In addition to buying all of their het acid from Hooker, Albright & Wilson will pay to Hooker a 6 per cent royalty on sales of products manufactured from het acid." (Tr. p. 258.)

Statements in the three audit reports add little regarding the nature of the arrangement, except that the exclusive territory which Albright & Wilson was granted by Hooker was for the resale of het acid or products derived from it. (Pl. Ex. 31, p. 7; Pl. Ex. 32, p. 6; Pl. Ex. 33, p. 6.) It is to be noted, however, that none of the auditors reported that Albright & Wilson was to pay royalty to Hooker on the *het acid* resold by Albright & Wilson, as alleged in the complaint.

The evidence regarding the corporate relationship of Hooker and Albright & Wilson is as follows:

(1) In a Hooker proxy statement of 1956, it was stated that a stockholder's meeting was to be held on November 29, 1956, to consider and act upon certain matters, including the proposed consolidation of Hooker and Oldbury Electro-Chemical Company; that Albright & Wilson owned 84 per cent of the Oldbury capital stock; and that each outstanding share of Oldbury capital stock would be exchanged for 45 shares of common stock of the consolidated corporation. Thus, the owners of Oldbury would receive approximately 450,000 shares of Hooker stock, Albright & Wilson thereby acquiring some 370,000 shares of Hooker's common stock, out of a total of 6,800,900 shares outstanding.

(2) In 1957, Mr. Casella of Hooker informed Mr. Lorant of Velsicol that by virtue of Hooker's purchase of Oldbury, Albright & Wilson was the largest single stockholder of Hooker.

(3) The maximum amount of stock held by Albright & Wilson between March 1, 1951 (the effective date of the contract) and the time of the trial of this case is 7½ per cent.

(4) Hooker has no directors on the board of Albright & Wilson, and Albright & Wilson has no directors on the board of Hooker.

Evidence regarding the prices that Hooker has charged Albright & Wilson for het acid is as follows:

In the second, third, and fourth audit reports, it was stated in substance that substantial amounts of het acid had been sold to a certain foreign customer (at the trial the auditors testified that this customer was Albright & Wilson) at prices significantly less than the prices noted for other foreign customers (second audit report), or significantly less than the listed domestic prices (third and fourth audit reports).

Evidence on actual prices is that during one period the Albright & Wilson price was 37 cents as opposed to 40 cents per pond for one other foreign customer, and that in a subsequent period the price to Albright & Wilson was 30 cents to 33 cents, as opposed to 40 cents to 42½ cents per pound for Japan, and 46 cents to 48 cents per pound for other foreign countries. In 1963, the price to Albright & Wilson was 37.8 cents per pound, while the average price in the domestic market was 37.3 cents per pound.

It appears, then, from the rather sparse evidence on prices, that Albright & Wilson may receive preferential treatment of a sort from Hooker. Is this treatment a bad faith effort to lower the royalties payable to Velsicol? Is Hooker lowering its sales price on het acid, but in effect making up the difference in the royalty payments from Albright & Wilson? Is Velsicol entitled to 5% of the royalty payments Hooker receives

from Albright & Wilson on the latter's sale of products made from het acid in Europe; or 5% on a portion of the royalty payments?

It should first be said that if plaintiff had shown that Hooker receives royalties based upon Albright & Wilson's resale of *het acid,* plaintiff would probably be entitled to receive as royalty five per cent of these royalties paid by Albright & Wilson to Hooker. Cf., Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 176 F.2d 73, 75 (10th Cir. 1949), cert. denied, 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950). There is no proof, however, that Albright & Wilson has paid royalties on the resale of het acid, and plaintiff in its post-trial briefs does not argue that royalties are paid to Hooker on this basis.

The only logical conclusion I can make regarding the arrangement between Hooker and Albright & Wilson is that the latter is licensed by Hooker to produce hetron resins or other products made from het acid on which Hooker holds foreign patents. That is the clear thrust of Mr. Dean's testimony and the portions of the audit reports referred to above. Even if the hetron patents are licensed to Velsicol under the contract here involved (a question not involved in this case), it is a non-exclusive license, and there is no question that Hooker is and has been free to grant licenses to third parties under its own patents. Defendant has stated in its post-trial brief that Albright & Wilson is so licensed. Plaintiff objects to this statement as unsupported by any evidence. However, the proof regarding the arrangement is subject to this interpretation, and plaintiff has suggested no other logical inference that can be drawn. Plaintiff asserts that defendant had the burden of explaining the nature of the arrangement because it is in control of the evidence on this matter; plaintiff, however, by discovery procedures, could have obtained all relevant information, and cannot so easily shift the burden of proof on this question.

In this state of the record, then, I must assume, for lack of proof to the contrary, that Albright & Wilson pays no "royalty" on resale of het acid, and that the royalty it pays is on products made from het acid under license from Hooker. The only facts remaining that can possibly suggest an artificial depression of the sales price on het acid sold by Hooker to Albright & Wilson are (1) that the prices at times have been less than prices to other foreign and domestic customers, and at times higher than the average domestic price; and (2) that Albright & Wilson holds or held the largest single block of Hooker stock, with the maximum amount being 7½ per cent of outstanding shares, and neither Hooker nor Albright & Wilson has had a director on the board of the other corporation.

Considering these facts singly or in combination, I cannot find a sinister motive in Hooker's dealing with Albright & Wilson. The latter has not been shown to have any control over Hooker through either management or ownership. Although, under the contract terms, Hooker of course could not evade payment of royalties to Velsicol by subterfuge, as it was the intent of the contract that royalties be paid on the basis of legitimate and bona fide sales prices, see Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., cited supra, the contract places no limitations upon Hooker's freedom to set its own prices. It could legitimately charge a lower price to a customer to which "a very substantial amount of Het Acid sales are made" (4th audit report, Pl. Ex. 33, p. 5), and which customer had been granted an exclusive territory for the resale of het acid and products produced therefrom.

 The proof, therefore, is entirely consistent with an arms-length arrangement between Hooker and Albright & Wilson. It may be that the het acid price to Albright & Wilson has been influenced by the fact that Hooker receives royalties for certain products which Albright & Wilson manufactures from het, but I cannot make a finding on the basis of sur-

mise. The prices charged are not so palpably out of line with prices charged to other customers, domestic or foreign, considering that Albright & Wilson is a substantial buyer, and the six per cent royalty paid by Albright & Wilson to Hooker is not so high, that I can find from the arrangement deception or wrongful evasion of Hooker's obligations to Velsicol under the contract.

 Plaintiff's evidence was insufficient to shift to the defendant the burden of going forward with the evidence. Plaintiff contends that it has proved enough to require a finding on its behalf absent a full explanation by Hooker of the arrangement. Plaintiff had the means, however, through discovery procedures, of obtaining more complete facts on this issue, and its failure to establish a more conclusive case suggests that more facts may not have strengthened its position.

As I find no evasion of the contract in the price charged by Hooker on sales of het acid to Albright & Wilson, there is no basis for ruling that these prices cannot be used in computing "other royalties influenced by this factor." (Pl. Br. p. 65.) It is clear from the evidence, chiefly the audit reports, that the "other royalties" referred to in plaintiff's brief and in the allegations of the complaint are the royalties paid by Hooker on chlorendic used in the production of other products. As I have previously noted, no issue is before me regarding the manner in which these royalties on the intermediate should be computed, under the terms of the contract. Count II is the only count relating to the computation of these royalties, and defendant has admitted the allegations of that count, except as to whether it has in fact paid on the basis plaintiff alleges is applicable. As to what prices should be used in computing an average price which is then applied as a royalty basis for the chlorendic used in the hetrons and similar "end products," no issue has been raised other than plaintiff's contention that the average should be adjusted to eliminate the effect of the allegedly improper arrangement between Hooker and Albright & Wilson, and the issue regarding this arrangement has been resolved adversely to the plaintiff.

## COUNT II AND RELATED ISSUES

Count II of the complaint is an alternative to Count I, to be considered in the event this court finds, as it does, that royalty is to be based upon the intermediate chlorendic rather than upon the end products.

In this count, plaintiff alleges that, in computing its royalties, defendant has estimated the chlorendic anhydride and acid content of the resins and other hex derivatives on the basis of a mathematical ratio determined on the basis of periodic laboratory tests of the products and thereby has excluded chlorendic lost in the production process or in chemical reaction and used in research and as samples. Plaintiff asserts, therefore, that defendant is liable to it for royalties on the chlorendic anhydride and acid thus excluded.

In answer, defendant avers that it has paid royalties on all chlorendic used by it, including that used for samples, in research, and lost in the production process. Thus, no issue is raised regarding how the royalty should be computed for chlorendic used in the production of other products; the only issue is whether defendant has in fact paid on the agreed basis.

The facts pertinent to Count II essentially are not in dispute; however, in their post-trial briefs, defendant argues that the evidence shows it has made all payments sought by plaintiff in this count, while plaintiff argues that defendant's restrictions upon the records available to plaintiff's independent auditors have prevented verification of the correctness of defendant's payments. Therefore, it is appropriate to consider at this point not only the allegations of Count II and the evidence relating thereto, but also the allegations of Count III charging that defendant has breached the contract provisions regarding the audit of records and Hooker's second affirmative

defense of payment and the evidence relating to these issues.

Four audits of defendant's records have been made by Arthur Andersen & Company for the plaintiff under the audit provisions of the contract. The evidence concerning these audits shows as follows:

*The First Audit.* The first Arthur Andersen audit took place in 1958 and covered the period of four years and nine months ended August 31, 1958. The audit report for this period stated that royalties had not been paid on quantities of chlorendic used in research, lost in hetron production, shipped as samples, and representing inventory, but rather had been computed in pounds on the basis of mathematical ratios determined from periodic laboratory tests of the finished product. The auditor recommended that the royalty be computed upon the basis of all chlorendic transferred to production for hetrons, and in the report he made a computation showing the amount by which royalties would have been increased had they been computed without excluding the chlorendic used in samples and research, held in inventory, and that lost in production. The auditor stated that the amount of increase would be "about $11,150."

In 1962, defendant sent a check for this amount to plaintiff, to satisfy this claim, and (except for Velsicol's demand that amounts paid on intermediate chlorendic should be adjusted because of the influence of the price charged by Hooker to Albright & Wilson—which demand I have rejected) defendant does not claim that further royalty payments are due for this period.

Plaintiff does not contend that any undue restrictions were placed upon the auditor's access to Hooker records for this period.

*The Second Audit.* The second audit covered the year and six months period ended February 29, 1960. The audit report shows that as of September 1, 1958, Hooker had changed its accounting method to adopt the recommendation made in the first audit report, and was computing the royalty for chlorendic used in production of the hetrons on the basis of all chlorendic transferred into hetron production. Thus, the "mathematical ratio" to which plaintiff objects in Count II was not used, and there was no exclusion of any chlorendic used in samples or in research or lost in the production process.

 After this audit was substantially completed, Hooker denied the auditor further access to the records showing production, sale and inventory of hetrons. Article 5(C) of the contract provides as follows:

> "HOOKER shall keep records in sufficient detail to enable the royalties payable to VELSICOL hereunder to be readily ascertained and shall permit such records to be examined by an independent certified public accountant from time to time during usual business hours to the extent required to verify the correctness of any royalty payable hereunder."

Since, as I have held, Hooker is not obligated to pay royalties based upon the resins made and sold, but only on the intermediate, access to the production and sales records on hetron resins or other derivatives made from the chlorendic is not required to verify the correctness of royalty payable upon the chlorendic used in the resin production, nor has plaintiff argued that those records are required to verify the correctness of the royalty payable on the intermediate. The parties agree that the royalty should be based upon the chlorendic transferred to resin production, if payable only on the intermediate; consequently no improper restriction was placed upon the auditor in making the second audit.

Thus, Velsicol has not shown, by any evidence or any argument, that the payments made by defendant on the chlorendic used in hetron production and reviewed in the second audit report are inadequate payments on the intermediate. No undue restrictions were placed

upon access to Hooker records by the auditor with respect to his investigation of amounts due on chlorendic used in hetron production. Defendant has made full payment on the chlorendic used in hetron production for the period ended February 29, 1960, in accordance with the demands made by plaintiff in ·Count II.

*The Third Audit.* The third audit covered the year and three months period ended May 31, 1961. What I have said above concerning the second audit applies to this audit, as well. Hooker continued to compute the royalty for chlorendic used in hetron production on the basis of that transferred into hetron production; Hooker has made full payment of royalty for the chlorendic so transferred as demanded in Count II, and the only restriction placed upon the records to which the auditor had access was that the records on hetron production and sale were not made available. These records were not necessary to the audit.

*The Fourth Audit.* The fourth audit covered the year ended May 31, 1962. During this period, Hooker continued to pay royalty on the basis of the chlorendic transferred to hetron production, and it continued to deny access to the hetron records. For this audit, however, a new restriction was placed upon the Hooker records that the auditor was given access to: the auditor was not allowed to see records showing the sales, production, and inventory of hex, except for the amount of hex which was used in the production of chlorendic. Up until this point, the auditors had started their investigations with these records, and then accounted for subsequent uses of the raw material.

Defendant contends that since the contract had been terminated prior to this audit, and since the only license it retained under the Velsicol patents was under the chlorendic patent, it had become unnecessary for the auditor to examine any records but those on chlorendic and its uses.

Mr. James L. Krebaum, who made this audit, testified that examination of the hex records was to be "the starting point of our audit." He further testified as follows:

"I was given the plant consumption vouchers which recorded usage of $C_{56}$ in the production of het acid and het anhydride. However, from an audit standpoint, I cannot know that this was all of the usage of this material for this purpose because I did not account for $C_{56}$ material." (Tr. at p. 317.)

The audit report for this period (Pl. Ex. 33) states as follows:

"During the current audit Hooker further declined to permit us access to its production, sales, inventory and usage records of $C_{56}$ except for records on consumption of $C_{56}$ used in the production of Het Acid and Het Anhydride. Hooker contended that since our audit should be concerned only with Het Acid and Het Anhydride (the only derivatives of $C_{56}$ Hooker considers subject to royalties) our only interest in $C_{56}$ should be those records recording consumption in the production of these derivatives. This limitation substantially reduced the benefits to be derived from our audit since we had no way of testing the total usage of $C_{56}$, and thus could not verify that royalties had been paid on all of the Het Acid and Het Anhydride produced or on any other derivative of C56, if any, produced."

■ I find that Hooker's refusal to permit the auditor access to the hex records requested constituted a breach of the contract, as those records were required to verify the correctness of any royalty payable under the contract. The contract calls for defendant to permit access to all records necessary to verify the correctness of the royalties payable thereunder, and I consider that this provision means all records which, under good accounting procedures, the auditor requires to verify the relevant records. Prior audits had all begun with the hex records, and then the raw material

had been traced through subsequent stages. And in the fourth audit, the Arthur Andersen auditor considered that a proper audit had to begin with the raw material, in order to verify the records on chlorendic production.

In effect, defendant says that the auditor should take defendant's word for it that its chlorendic records on consumption are correct. But defendant produced no qualified witness to testify that by good accounting practice the hex records would not be required to verify the correctness of the royalties payable under the contract. In this state of the record, the Arthur Andersen view must be accepted, as without question a reputable and qualified view of what records are required to verify the correctness of the royalty payable under the contract.

One further question remains to be considered in connection with Count II and the issues of payment and restrictions upon the audits. Count II relates to the use of chlorendic in the production of Hetron resins and *other* derivatives of $C_{56}$. It appears of record that, in addition to the resins, defendant produces at least one other product—Hetrofoams—from chlorendic anhydride or acid. In its post-trial brief, plaintiff states, at page 3:

> "Hooker also apparently makes other products from Het anhydride and acid, but since Velsicol's independent audtiors were denied access to certain of Hooker's records (see Point IX, below), Velsicol is unable to state with certainty what these products are."

Plaintiff has not contended, in Point IX of its brief or otherwise, that the auditors were restricted from discovering whether chlorendic was used in the production of products other than hetron resins. It may be that, as in the case of the hetron resins, defendant denied the auditors access to production records on Hetrofoams or other "end products." But there is no evidence that the auditors were unable to determine whether any royalties were due on the intermediate chlorendic used in the production of any product besides the hetrons.

The first three audit reports contain no indication that the auditors were unable to investigate this question, and apparently they were able to do so, as the only restriction reported concerned the hetron resin records on production, sales, and inventory, during the second and third audits. In the first audit report, the auditor stated as follows:

> "During the course of our review, we noted interplant transfers of Het Acid used in a product for which no royalty had been paid. The amount of royalty computed on all such material transferred and sold through November 30, 1958, was $1,282.73. We discussed this matter with Hooker and an additional royalty in this amount was paid."

There is no reference in the second or third report to the use of chlorendic in any product besides hetrons.

As to the fourth audit period, during which the auditor was denied access to hex records as well as to hetron records, there is no indication that the auditor was restricted from investigating whether any of the chlorendic produced was used in the production of products other than hetrons. It should be stated, however, that in any re-audit of this period and in any audit of subsequent periods, the independent auditor retained by plaintiff should of course have access to any records he may require to determine whether royalties are owed by defendant on chlorendic used in the production of not only hetrons but any other products as well.

With regard to Count II of the complaint, and the defense of payment, I find that for the first three audit periods, ending May 31, 1961, defendant has made full payment on the chlorendic anhydride and acid used in the production of other products, in accordance with the demands of Count II. Its payments for subsequent periods are subject to audit in accordance with the provisions of the contract.

With regard to the allegations of Count III concerning defendant's restriction upon audits, for the periods covered by the first three audits, Hooker placed no undue restrictions upon the auditors' access to books and records, and plaintiff has not established any reason why these periods should be re-audited. As I have held, in considering the Albright & Wilson issues, plaintiff has failed to establish that Hooker owes greater royalties on its sales to Albright & Wilson and that other royalties influenced by this factor should therefore be adjusted. Consequently, no re-audit of the first three audit periods has been shown necessary.

Plaintiff is entitled to a re-audit, however, for the period from May 31, 1961, to May 31, 1962, pursuant to the terms of the contract, in which the auditor shall not be denied access to defendant's records regarding sales, production, and inventory of hex, or to any other records required to verify the correctness of any royalty payable under the contract. And in any future audits made under the terms of the contract for periods subsequent to that ending May 31, 1962, and up to the date of this decree, defendant shall permit the auditor access to these records and any others required to verify the correctness of any royalty payable under the contract.

## COUNT IV: DEFENDANT'S RIGHT TO SELL UNDER PLAINTIFF'S FOREIGN CHLORENDIC PATENTS

In Count IV of the complaint, plaintiff alleged that prior to termination of the contract, defendant exported hex derivatives to foreign countries in which plaintiff owns valid patents covering those derivatives.[4] Plaintiff asserts that defendant had a right to export such products to those countries, because under the contract defendant was licensed

under both the foreign and domestic hex patents of Velsicol. Plaintiff further alleges that defendant claims a right, under Article 7(C) of the contract, to continue to export hex derivatives to these countries and has continued in such exportation subsequent to termination of the contract. Plaintiff alleges that Article 7(C) gives defendant no license under plaintiff's foreign patents and seeks a declaratory judgment that defendant has no right, under the contract, to continue to export a derivative of $C_{56}$ to any foreign country where Velsicol owns a valid product patent covering that derivative.

In answer, defendant asserts that under the terms of the agreement it has the right to continue to sell these products in such foreign countries.

Before reaching the principal issues raised in this count, I must consider the preliminary argument of defendant that no "actual controversy" or "justiciable issue" is presented in the allegations of this count. Defendant maintains that, while there is a controversy between the parties as to their respective rights under Article 7(C) of the contract, the question presented is abstract and not subject to a judicial grant of a specific relief through a court decree of a conclusive character.

After due consideration of this question, I conclude that an actual controversy exists between plaintiff and defendant, as to whether under the contract defendant is licensed under foreign product patents of plaintiff, since defendant intends to export chlorendic products and is exporting such products to countries where plaintiff holds chlorendic patents. This court has authority under 28 U.S.C. § 2201 to declare the rights and legal relations of the parties with regard to Article 7(C) of the contract.

Defendant apparently considers that plaintiff is seeking a determination by this court that defendant has infringed

---

4. The countries in which plaintiff holds patents corresponding to its United States chlorendic patent are as follows: Austria, Belgian Congo, Belgium, Canada, Cuba, Denmark, France, Holland, Japan, Portugal, and Sweden. These patents are apparently valid patents, but I do not consider that this Court has authority to rule upon their validity in this proceeding.

certain of plaintiff's foreign patents. The question, however, is not one of infringement, but rather is whether or not defendant retained a license to sell under Velsicol's foreign chlorendic patents by virtue of Article 7(C) of the contract.

This question, it seems to me, is precisely the kind of issue that the Declaratory Judgment Act was designed to resolve. In Aetna Casualty & Surety Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937), it was stated:

"The statute providing for declaratory judgments meets a real need and should be liberally construed to accomplish the purpose intended, i. e., to afford a speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships."

A declaratory action, Moore states, has "great utility" in determining the meaning of contracts. Moore, Federal Practice, para. 57.21[4], p. 3129 (2d ed. 1953). Its utility is particularly evident in the present case. If plaintiff could not obtain a construction of the contract in this action, its only recourse would be to institute proceedings in each foreign country to which defendant exports chlorendic products and in which plaintiff holds chlorendic patents.

 Of course this Court should decline to grant declaratory relief where its judgment would not settle the controversy, and its solution must "admit of specific relief through a decree of a conclusive character." See John Hancock Mutual Life Ins. Co. v. Webcor, Inc., 311 F.2d 701, 705 (7th Cir. 1962). While no case precisely in point has come to my attention, it appears to me that, clearly, resolution by this court of the question raised in Count IV will be conclusive.

 If the question is resolved in favor of defendant, can Velsicol subsequently initiate proceedings abroad charging Hooker with infringment of the patents held to be licensed to Hooker in the instant case? 28 U.S.C. § 2202 provides that "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." Courts of equity have power, under proper equitable circumstances, to enjoin parties within their jurisdiction from prosecuting actions in foreign countries. Cole v. Cunningham, 133 U.S. 107, 116–117, 10 S.Ct. 269, 33 L.Ed. 538 (1890); Blanchard v. Commonwealth Oil Co., 294 F.2d 834, 841 (5th Cir. 1961). In Harvey Aluminum Inc. v. American Cyanimid Co., 203 F.2d 105 (2d Cir. 1953), the Court of Appeals held that the district court had discretion to enjoin a party from prosecuting another action in British Guiana on the ground of vexatiousness, and it remanded the case so the district court could consider the party's prayer for the injunction. On remand, the district court granted the injunction. Harvey Aluminum, Inc. v. American Cyanimid Co., 15 F.R.D. 14 (S.D.N.Y.1953). And in Sperry Rand Corp. v. Sunbeam Corp., 285 F.2d 542 (7th Cir. 1960), although the Court of Appeals for the Seventh Circuit reversed a district court order enjoining the plaintiff from instituting an action against the defendant in Germany, because the German action was not vexatious and involved issues separate from those involved in the American action, the Court recognized that a party may be restrained from maintaining vexatious or harassing actions in foreign countries. One argument advanced by the defendant in that case was that a certain settlement agreement resolved all issues in all foreign countries with respect to all foreign affiliates of plaintiff and defendant. The Court disagreed, finding no support for this argument in the wording of the agreement or the facts of record, but did not suggest that a party could *not* be enjoined from

prosecuting a foreign action if an agreement in issue *did* resolve questions between the parties raised in the foreign proceedings.

It seems clear from these decisions that if the question raised in Count IV is resolved in favor of Hooker, the decision of this Court will admit of specific relief through a decree of a conclusive character. If the question is resolved in favor of Velsicol, it logically follows from the decisions that Hooker could be restrained from defending, in foreign infringement actions, on the ground that it was licensed to sell, by the contract involved in this case, under the foreign chlorendic patents of Velsicol.

 It should also be noted that foreign courts would likely give conclusive effect to the judgment of this court regarding the meaning of Article 7(C). Generally, as a matter of comity, the judgment of a foreign court is given conclusive effect and full faith and credit in United States courts, provided the judgment is not tainted with fraud and the foreign court had jurisdiction over the subject matter and of the parties. E. g., Gull v. Constam, 105 F.Supp. 107 (D.Colo.1952). Presumably, the same courtesy would be extended by a foreign court to the judgment in the case at bar.

The substantive issues raised in Count IV turn upon the meaning of Article 4 of the contract, the grant of rights for the duration of the contract, and Article 7(C) of the contract, the provision regarding what rights shall not be affected by termination of the contract.

As plaintiff admits, Hooker was licensed under Velsicol's foreign chlorendic patents for the duration of the contract. Article 4 provides as folllows:

"VELSICOL grants to HOOKER a non-assignable right and license under the Licensed Patent Rights of Velsicol to use the inventions therein described and claimed, and to make and sell the Derivatives of $C_{56}$ resulting therefrom * * * [provided that no license is granted to make or sell certain specified products.]"

In Article 1(B), the term Licensed Patent Rights of Velsicol is defined to mean:

"each patent and each application containing an allowed claim claiming derivatives of $C_{56}$ or methods of making the same under which Velsicol and its Affiliate and Subsidiary Companies now have or during the life of this Agreement acquire the right to grant a license."

It was the clear meaning and admitted intent of the parties that the Licensed Patent Rights of Velsicol were not limited to Velsicol's United States patents, but included foreign patents as well, and Schedule B, affixed to the contract, lists both foreign and domestic patents.

Article 7 of the contract provides, in subsection (A), that unless otherwise terminated, the contract shall continue in full force and effect until the expiration of the last Licensed Patent Right, and, in subsection (B), that after ten years from the date of the agreement, either party may terminate the agreement by giving 90 days' prior written notice of termination to the other party. Subsections (C) and (D) provide as follows:

"(C) Any such termination shall not affect the right of either party to continue to use any process for the manufacture of any product under any Licensed Patent Rights of the other party, or the obligation of either party to pay royalties hereunder, provided such use commenced prior to the effective date of any such termination.

"(D) Use under any Licensed Patent Right shall be deemed to have been commenced when a minimum of Ten Thousand Dollars ($10,-000.00) in royalty has been paid or is payable hereunder by virtue of said use, or upon the giving of written notice by either party to the other signifying intent to commence use, with a guaranteed minimum royalty of Ten Thousand Dollars

($10,000.00) due and payable for such use, prior to the effective date of any such termination, provided, however, that the user party hereunder may terminate this Agreement with respect to any such use in accordance with paragraph (B) of this Article."

Plaintiff's position is that under subsection (C), the only right retained by defendant is the right to "continue to use any *process* for the manufacture of any product under any Licensed Patent Right of Velsicol" where such *process* use commenced prior to termination. Plaintiff argues that since the only process Hooker used under a Licensed Patent Right of Velsicol prior to termination was the process for the manufacture of chlorendic described in the United States patent, and Hooker did not use the chlorendic process in any foreign country where Velsicol holds chlorendic patents, the only right defendant retains is the right to use the chlorendic process in the United States. Plaintiff asserts that defendant retains no license to sell chlorendic, or products made from the chlorendic it produces, under plaintiff's foreign *product* patents, because the right defendant retains is only for the use of a *process*. Plaintiff states that "Since the right to sell the product of a patented process is a necessary incident to the enjoyment of the right to use the process of the patent, Hooker may sell such product in the United States, but it may not sell in any other country where Velsicol has patent protection on the product without infringing the foreign patent." (Pl.Br. p. 67.)

A fallacy is immediately apparent in the quoted argument of plaintiff. The right to sell is not a "necessary incident" to the enjoyment of the right to use the process of a patent. Mitchell v. Hawley, 16 Wall. (83 U.S.) 544, 21 L.Ed. 322 (1872); Rice v. Boss, 46 F. 195 (N.D.N.Y.1891). It is clear that "The patentee may make and grant a license to another to make and use the patented articles but withhold his right

to sell them." United States v. General Elec. Co., 272 U.S. 476, 490, 47 S.Ct. 192, 197, 71 L.Ed. 362 (1926). Under the particular circumstances surrounding the making of a contract, however, a right to sell may be implied by the grant of a right to manufacture, as where the licensee is engaged in the business of manufacture for sale. Under such circumstances, the right to sell is implied, absent an express provision in the contract that no right to sell is granted. Poirier v. Bradford, 119 Minn. 475, 138 N.W. 687, 43 L.R.A.,N.S., 142 (1912). Also, where the contract contains other provisions indicating that the parties understood a right of sale to be granted, the right of sale will be implied. Cf. Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp., 266 F. 71 (2d Cir. 1920) (aeroplanes manufactured by British government were to "become and be the absolute property of the British government"; also, for reasons peculiar to the contract involved, the British government was regarded as a "vendee"). Therefore, if Article 7(C) permits the defendant to continue to sell chlorendic, it does not do so merely by stating that defendant may continue to use the chlorendic process in the manufacture of products, but does so by virtue of the implications of other provisions of the contract, the surrounding circumstances, and the underlying purpose of the termination provisions.

When these matters are considered, it can be seen that the language of Article 7(C) cannot be read literally, for then it makes no sense: Granting no right to sell, the provision nevertheless specifies that termination shall "not affect * * * the obligation of either party to pay royalties hereunder." Under Articles 3(A) and 5(A), royalties are to be paid on products "made and *sold*" under the Licensed Patent Rights of the other party. A right to sell is thus necessarily implied by the portion of Article 7(C) which continues the obligation of the parties to pay royalties under the contract. If it does not imply a license

to sell, then it must be regarded as completely superfluous.[5] But a well-established rule of contract interpretation is that "The court will if possible give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." Williston & Thompson, Law of Contracts § 619, at 493 (revised ed. 1938).

Additionally, a right to sell is implied by the provisions of subsection (D), specifying that "use" under subsection (C) has commenced with the payment of royalties of $10,000, or with the guarantee of royalties in that amount. It is the clear purpose of subsections (C) and (D) that once a party has made an investment in a product in reliance upon its patent rights under the contract, and it has paid or guaranteed the minimum royalties, that party's investment will be preserved. The investment is preserved only if the party can continue to sell.

The next and crucial question is, does Article 7(C) continue Hooker's license to sell only under the United States chlorendic patent? I can find no reason for saying that the license is so limited. Plaintiff's only argument in support of a geographic limitation is that defendant is licensed to sell only where it uses the process, because the only license to sell granted by subsection (C) is as a "necessary incident" to the right to use the process. As shown above, however, the right to sell is not a necessary incident to the right to use the process, but rather is implied in the royalty provision and underlying purpose of subsections (C) and (D). And considering subsection (C) in light of its purpose, the license of a party under that provision to sell a product manufactured under a Licensed Patent Right of the other party must be coextensive with its license to sell that product as it existed during the life of the contract. Otherwise the termination provision curtails the ability of the licensee to profit from the investments made in reliance upon its license under the contract, whereas the purpose of the provision was to preserve that ability.

This interpretation is consistent with the treatment of corresponding domestic and foreign patents in other portions of the contract, which evidences no intent to fracture rights into geographic compartments. In Article 4, a broad grant of patent rights is spelled out, and no separate grant is made with respect to domestic and foreign patents. Concurrent use of corresponding domestic and foreign patents was contemplated, and Article 5(D) specifies that "The royalty payable hereunder by Hooker shall not be increased by virtue of the concurrent use of more than one Licensed Patent Right of VELSICOL."

Plaintiff in its brief relies upon several decisions regarding the territorial limitations of patents and the right of a party holding a patent in one country to protection against the sale in that country of articles produced in foreign countries. These cases are pertinent, however, only if defendant no longer is licensed to sell under plaintiff's foreign chlorendic patents. I find, however, that defendant is still so licensed under those patents.

### OTHER ISSUES RAISED BY THE PLEADINGS

Two other issues were raised by the pleadings but are no longer at issue in this case. In its answer, defendant pleaded as an affirmative defense the New York Statute of Limitations, but in its post-trial memorandum concedes that the Illinois Statute of Limitations

---

5. Or it must be regarded as obligating royalty payment on articles made under the Licensed Patent Rights of the other party, and sold in countries where the other party has no product patent, thus implying no license to sell under the other party's patents. Whatever other problems might arise with such an interpretation, it is inconsistent with the purpose of Articles 7(C) and (D), as discussed in the following paragraphs of the text.

of ten years governs the instant case. Defendant also pleaded as an affirmative defense to Count I of the complaint that plaintiff was seeking an unwarranted extension of its patent monopoly. In its post-trial brief, defendant has abandoned this defense.

Defendant's first affirmative defense is in the nature of a general denial and requires no separate consideration in this memorandum.

A judgment order will be entered in accordance with the determinations made in this memorandum of decision, which shall stand as the Court's findings of fact and conclusions of law within the meaning of Rule 52 of the Federal Rules of Civil Procedure.